# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**BENSON TOWER CONDOMINIUM OWNERS ASSOCIATION**, an Oregon nonprofit corporation,

Plaintiff,

v.

**VICTAULIC COMPANY**, a foreign corporation,

Defendant.

Case No. 3:13-cv-01010-SI

**OPINION AND ORDER**

Michelle K. McClure and Stuart K. Cohen, LANDYE BENNETT BLUMSTEIN, LLP, 3500 Wells Fargo Center, 1300 S.W. Fifth Avenue, Suite 3500, Portland, OR 97201; Jennifer L. Snodgrass and Richard N. Sieving, THE SIEVING LAW FIRM, P.C., 100 Howe Avenue, Suite 220N, Sacramento, CA 95825. Of Attorneys for Plaintiff.

Anne Cohen and Sharlei C. Hsu, SMITH FREED & EBERHARD, 111 S.W. Fifth Avenue, Suite 4300, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff, Benson Tower Condominium Owners Association ("Plaintiff" or

"Association"), brings this action against Defendant, Victaulic Company ("Defendant" or

"Victaulic"), as the manufacturer of allegedly defective plumbing products installed in the

Benson Tower Condominium. Before the Court is Defendant's Motion for Summary Judgment

(Dkt. 89) on Plaintiff's claims for strict products liability, negligence, breach of express warranty, and fraud, and Defendant's Motion to Strike Punitive Damages (Dkt. 82). For the reasons that follow, Defendant's motions are granted in part and denied in part. Defendant's motion is granted with respect to Plaintiff's claims for breach of warranty and fraud and is denied in all other respects.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Plaintiff is a condominium association organized under the Oregon Condominium Act, Or. Rev. Stat. (hereinafter "O.R.S.") § 100.005, *et seq.*, and is the governing body of the Benson Tower Condominium ("Benson Tower"). Benson Tower was completed in approximately 2008 and includes 143 separate living units. Each individual owner of a separate living unit in Benson

Tower owns the interior of his or her respective unit, and each is a member of Plaintiff. All of the individual owners own in common the general common elements of Benson Tower. The general common elements include, but are not limited to, the pipes, ducts, flues, conduits, wires, and other utility installations to their respective outlets in each individual living unit. Except for certain items not relevant here, Plaintiff is responsible for the maintenance, repair, and replacement of the general common elements in Benson Tower. Although Plaintiff arranges and pays for the cost of that work, Plaintiff then assesses and apportions those costs to the individual unit owners.

Defendant, Victaulic, is a New Jersey corporation that develops, markets, and supplies valves, pipe couplings, flanges, and gaskets for piping systems. Defendant distributes these components to suppliers and installers, including those doing business in Portland, Oregon. Certain products made by Defendant, including, but not limited to, butterfly valves, pipe couplings, flanges, and gaskets contain ethylene propylene diene monomer ("EPDM") rubber.

Certain Victaulic products containing EPDM were installed in the domestic, potable water piping system at Benson Tower ("Victaulic Products"). Plaintiff alleges that the potable water piping system installed throughout Benson Tower includes Victaulic Products that have prematurely deteriorated and failed or otherwise failed to properly perform. This deterioration, Plaintiff alleges, has resulted not only in damage to the Victaulic Products themselves, but also has caused property damage to Benson Tower's general common elements, including the domestic, potable water and entire water system within Benson Tower.

Benson Tower was constructed by ITC Construction Group ("ITC") as general contractor on behalf of the developer, Benson Tower, LLC (the "Developer"). In 2005, ITC contracted with JRT Mechanical, Inc. ("JRT") to install the plumbing systems in Benson Tower, pursuant to

engineering performed by Yoneda & Associates ("Yoneda"). JRT purchased Victaulic Products from F&S Distributors, Inc., a third-party distributor that purchased the Victaulic Products directly from Victaulic. Plaintiff alleges that JRT also purchased additional products for use in the Benson Tower directly from Victaulic. The Victaulic Products used in the Benson Tower's construction were delivered no later than February of 2007.

Plaintiff alleges that "[s]ince the early 1990s, Victaulic was aware that its Victaulic Products were susceptible to failure when exposed to chloramines or other approved and recommended applications and that the failure of the Victaulic Products caused damage to the systems and buildings into which they were installed." Specifically, "[b]efore construction of [Benson Tower], Victaulic knew that the Victaulic Products would fail when exposed to temperatures far less than 230° Fahrenheit, even though Victaulic represented and approved that the Victaulic Products were acceptable and recommended for use up to 230° F. Victaulic failed to disclose this fact to its consumers, including Plaintiff." Further, "Victaulic knew that the Victaulic Products would fail when exposed to chloramines, yet Victaulic recommended and approved the use of the Victaulic Products in systems where chloramines were used as a disinfecting agent. Victaulic failed to disclose this fact to its consumers, including Plaintiff."

Plaintiff further alleges that the Victaulic Products installed in Benson Tower's piping systems contain EPDM designated by Victaulic as "Grade E" and that Victaulic expressly represented that Grade E gaskets are recommended for both cold and hot potable water service up to 230º Fahrenheit. Plaintiff further alleges that beginning in the early 2000s, Victaulic became aware that the Grade E EPDM used in the Victaulic Products was defective and exhibited severe degradation, deterioration, and disintegration. By 2008, Victaulic was aware that its Grade E EPDM degraded when exposed to chloramines. Moreover, before the

construction of Benson Tower, Victaulic "knew of claims of black particles and sludge in potable water as a result of its defective Victaulic Products." In sum, Plaintiff alleges that, before Benson Tower was constructed, Victaulic was aware of significant defects in the Victaulic Products, misrepresented the qualities and capabilities of those products, and failed to disclose material information about those products and their defects necessary to make Victaulic's representations not misleading (*i.e.*, half-truths).

## DISCUSSION

### A.  Strict Liability and Negligence

Defendant moves for Summary Judgment on Plaintiff's negligence and strict products liability claims, arguing that: (1) both claims are barred by the economic loss doctrine; (2) Plaintiff lacks the necessary special relationship with Defendant to recover purely economic loss; and (3) Plaintiff's damages are too speculative.

#### 1.  Economic Loss Doctrine

It is a fundamental principle of tort law that all persons are liable in negligence if their conduct unreasonably creates a foreseeable risk of harm to others. *Harris v. Suniga*, 344 Or. 301, 307 (2008). There are, however, several exceptions to that general rule. *Id.* Under Oregon law, a negligence claim may not be premised solely on "causing a stranger's purely economic loss without injuring his person or property. For a plaintiff to recover in those circumstances, the plaintiff would have to show some source of duty outside the common law of negligence, such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." *Id.* at 308 (citations and quotation marks omitted). Thus, if a plaintiff alleges only economic losses flowing from a defendant's negligence, a special relationship or statutory standard of care is required.

Economic loss has been defined by the Oregon Supreme Court as "financial losses such as indebtedness incurred and return of monies paid," as distinguished from "damages for injury to person or property." *Id.* at 306 (citing *Onita Pac. Corp. v. Trs. of Bronson*, 315 Or. 149, 159 n.6 (1992). The Oregon Court of Appeals has similarly discussed a line of Oregon cases defining "economic losses" as "financial losses to intangibles," such as lost profits, lost insurance proceeds, attorney's fees, and failed loan transactions. *Harris v. Suniga*, 209 Or. App. 410, 418 (2006) (citing Oregon cases), *aff'd* 344 Or. 301 (2008). "Unlike economic losses to third parties, which can be indeterminate and potentially unlimited, physical damage to property ordinarily can be ascertained, assessed, and paid." *Harris*, 344 Or. at 312 (economic loss doctrine did not bar claim for dry rot damage caused by negligent construction).

In this case, Plaintiff does not base its claim on a special relationship or status, but rather seeks to recover in negligence on the grounds that Defendant's alleged negligence resulted in foreseeable damage to property. Specifically, Plaintiff contends that the premature failure of Defendant's products has damaged the entire potable water system at the Benson Tower condominiums. Plaintiff claims that the allegedly defective Victaulic products and the claimed damaged property are distinct. The allegedly defective products are the Victaulic valves and couplings themselves. The allegedly damaged or physically harmed property is Plaintiff's potable water system, which as a result of Defendant's negligence now has black particles contaminating the water system and prematurely clogging appliances and filters connected to it.

Defendant responds that Plaintiff has demonstrated, at best, that the Victaulic Products that have prematurely degraded have damaged only themselves. Defendant relies upon case law holding that instances in which a product damages only itself concern damages that can be

foreseen and dealt with by contract. Thus, recovery under a theory of negligence is barred by the economic loss doctrine.

Defendant makes the same argument against Plaintiff's claim for strict products liability. Under Oregon law, to establish a claim for product liability, a plaintiff must prove that the defect in the product was of the type that rendered the product unreasonably dangerous to the user or consumer or to the property of the user or consumer. *Harris*, 209 Or. App. at 420 (citing O.R.S. § 30.920). To be unreasonably dangerous, the defective product need not be "[person]-endangering." *Id.* (citing *Russell v. Deere & Co.*, 186 Or. App. 78, 82 (2003)). It is sufficient if the product poses an unreasonable danger to the person's other property. *Id.* A product is not considered to be unreasonably dangerous to other property, however, if the only risk it poses is to itself. *Id.* A defect that merely decreases the product's value and subjects the user to economic loss is not unreasonably dangerous, *Brown v. Western Farmers Ass'n*, 268 Or. 470, 478 (1974), and the costs to remedy losses due to defects in the product itself are generally considered to be economic loss, not property damage. *See Russell*, 186 Or. App. at 82 (defective combine resulted in economic loss only, because it did not cause damage to other property). In contrast, damage to "other property" owned by the plaintiff is considered to be other than economic loss. *Gladhart v. Or. Vineyard Supply Co.*, 164 Or. App. 438, 446 (1999), *rev'd on other grounds,* 332 Or. 226 (2001) (disease brought by new grapes spread to mature grapevines and thus caused damage to other property).

In response to Defendant's argument under the economic loss rule against Plaintiff's negligence and strict products liability claims, Plaintiff provides testimony from several experts. According to Plaintiff, these experts show that damage has been done to property other than the Victaulic Products themselves. Plaintiff's expert Jerry J. Leyden stated that the black particles

found throughout the potable water system were made of EPDM rubber. Leyden's tests suggest

that this EPDM rubber came from Victaulic Products. Plaintiff's expert Dr. Gerald G. Fuller

opined that degradation of the EPDM rubber in certain Victaulic Products would release black

particles into the water system. Fuller further stated that the release of these black particles

contaminates the potable water system and damages the plumbing system. Plaintiff's expert

Roger Beekoy explains that the Victaulic Products that contain EPDM rubber used by Plaintiff

will continue to deteriorate due to exposure to chloramines in the Portland water supply and thus

will continue to contaminate the Benson Tower's potable water system until all Victaulic

Products have been removed and replaced. This evidence, construed in the light most favorable

to Plaintiff, demonstrates damage to more than the Victaulic Products themselves.

    Defendant responds by suggesting that: (1) water contaminated with black particles and

clogged filters and appliances does not constitute property damage; and (2) Plaintiff fails to

identify any Oregon case law recognizing damage to water as property damage. Regarding

Defendant's first point, the Ninth Circuit's recent decision in *City of Pomona v. SQM N. Am.

Corp.*, 750 F.3d 1036 (9th Cir. 2014) is informative. In that case, the Ninth Circuit, interpreting

California's economic loss doctrine,[1] noted that "California and federal courts alike have held

that pollution of groundwater is damage to property . . . ." *Id.* at 1051. *See also Tulare Lake

Basin Water Storage Dist. v. United States*, 49 Fed.Cl. 313, 319 (Fed. Cl. 2001) (relying on

California law). The court in *City of Pomona* distinguished between the allegedly defective

---

[1] California's economic loss doctrine is substantially similar to Oregon's version of the
doctrine. See *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 273 (2004) (Under
California law, "economic loss" consists of damages for inadequate value, cost of repair, cost of
replacement of defective products, and lost profit); *City of Pomona*, 750 F.3d at 1050
("California's economic loss rule provides that the recovery of economic loss under strict
products liability is appropriate only when there has been physical harm to persons or property
*other* than the allegedly defective product itself.").

product (in that case, fertilizer) and the damaged or physically harmed property (Pomona's groundwater). Because Pomona had presented a genuine dispute of material fact regarding property damage to the affected groundwater, the economic loss rule did not bar the recovery of damages under a negligence theory on summary judgment. In addition, in the interpretation of insurance contracts under Oregon law, the Oregon Supreme Court has recognized that contamination of water is property damage. *See Schnitzer Inv. Corp. v. Certain Underwriters At Lloyd's of London*, 341 Or. 128, 132 (2006).

It is not too great a leap of logic to conclude that property damage to groundwater resulting from chemical contamination is similar to property damage to a building's potable water system resulting from contamination caused by black particles of EPDM that are in the drinking water and that also clog filters and appliances.[2] Accepting the opinion testimony of Plaintiff's experts (which the Court must for purposes of Defendant's summary judgment motion), all domestic water entering the Benson Tower's potable water system is or will be contaminated by black particles composed of deteriorating EPDM rubber, this contamination is caused by faulty Victaulic Products, and this contamination will continue until all Victaulic Products are removed and replaced. Thus, Plaintiff has established a genuine dispute of material fact that is not appropriate for resolution by summary judgment.

The Court is also persuaded that this conclusion is appropriate given the Oregon Supreme Court's recent discussion of the purpose of the economic loss doctrine in *Harris*. In that case, a plaintiff discovered water damage to a home caused by a contractor's faulty construction work

---

[2] In arguing that Plaintiff has offered no authority that Oregon law recognizes damage to water, Defendant emphasizes that Plaintiff's members continue to use the potable water system for drinking, cooking, and bathing, including by adding a filter. If true, this may suggest that Plaintiff's damages are not particularly extensive or that the damage may be remedied or ameliorated by the removal of the deteriorating Victaulic Products. It does not, however, demonstrate that the contamination of the potable water system is not property damage.

and brought a negligence claim. *Harris*, 344 Or. at 306. The Oregon Supreme Court concluded that physical injury to a building caused by construction defects was property damage, rather than a purely economic loss, and thus actionable in negligence. *Id.* In discussing the history and purpose of the economic loss doctrine under Oregon law, the Court explained that:

> this court has identified the potentially limitless economic impacts of negligent conduct as the reason for barring claims for economic losses. That concern, however, is rarely present when the claim is for physical damage to real or other tangible property. Unlike economic losses to third parties, which can be indeterminate and potentially unlimited, physical damage to property ordinarily can be ascertained, assessed, and paid. Once a party has paid damages related to the physical injury to property caused by its negligence, its liability is at an end.

*Id.* at 312. Although not identical to the property damage at issue in *Harris*, the contamination of the Benson Tower's potable water system and the residents' clogged filters and appliances are the type of physical damage that "can be ascertained, assessed, and paid," and the concern for "potentially limitless economic impacts of negligent conduct" is not present. *Id; see also N. Clackamas Cnty. Water Comm'n v. Siemens Water Technologies Corp.*, 2014 WL 197811 (D. Or. Jan. 14, 2014) ("On the spectrum created by the Oregon Supreme Court between damage to property and 'purely economic losses,' the damage alleged here is more akin to dry rot than to a lost investment."); *Newman v. Tualatin Dev. Co.*, 287 Or. 47, 50 (1979) (Claim arising from deterioration of copper and galvanized pipes that were susceptible to degradation).

Construed in the light most favorable to Plaintiff, the evidence suggests that Victaulic products have damaged the Benson Tower's potable water system. Under Oregon law, this damage is property damage, rather than purely economic loss. Therefore, Defendant has failed to show that there is no genuine factual dispute as to whether Plaintiff's claims are barred by the economic loss doctrine and Plaintiff has provided evidence regarding damage to the Benson Tower's potable water system sufficient to survive summary judgment.

### 2. Special Relationship

Defendant argues that, without a special relationship between the parties, Plaintiff cannot recover on its negligence claim. Plaintiff responds that Oregon law does not require a special relationship for the type of damages at issue in this case, even if the damages were purely economic losses. As already discussed, to recover purely economic loss under Oregon law, Plaintiff "would have to show some source of duty outside the common law of negligence, such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." *Harris*, 344 Or. at 308 (citations and quotation marks omitted); *see also Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329 (2004). Because the Court finds that the limitations of the economic loss doctrine do not apply to the facts of this case, the precise boundaries of that rule need not be addressed at this time.

### 3. Speculative Damages

Defendant also argues that Plaintiff's damages are speculative. Defendant relies upon the Oregon Court of Appeals' decision in *Lowe v. Philip Morris USA, Inc.*, 207 Or. App. 532 (2006) *aff'd*, 344 Or. 403 (2008), which held that "a fundamental prerequisite of negligence liability under the law of this state is actual, present harm or injury." *Id.* at 545. Defendant appears to argue this point in anticipation of responding to an argument that Plaintiff does not actually make, specifically that deterioration of Victaulic products installed in the potable water system will cause future leaks and future property damage. Defendant's argument is premature, at best. Plaintiff has provided evidence that the Victaulic products installed in the Benson Tower's potable water system already have deteriorated and already have contaminated the potable water system with black particles and prematurely clogged filters and appliances. For purposes of a motion for summary judgment, Plaintiff's evidence of these actual damages is sufficient to allow Plaintiff's claim to proceed to trial.

## B. Breach of Express Warranty

Defendant moves for summary judgment on Plaintiff's breach of express warranty claim on that grounds that it is time-barred. Plaintiff responds that its claim is not time-barred for four reasons: (1) that Defendant made certain other express warranties that are not time-barred; (2) that the statute of limitations was tolled due to Defendant's fraudulent concealment of defects; (3) that Defendant waived any limitations of its express warranties by its conduct; and (4) that, to the extent that Defendant's disclaimer of warranties is enforceable, the limited warranties fail of their essential purpose.

### 1. Express Warranties

"An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." O.R.S. § 72.7250(1). The statute of limitations for a breach of warranty claim begins to run at the time of the breach. *Id.* O.R.S. § 72.7250(2) provides that "[a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." Because the statute requires explicitness, only an express warranty may qualify as a warranty of future performance. *Hunter v. Woodburn Fertilizer, Inc.*, 208 Or. App. 242, 246-47 (2006); *Permapost Products Co. v. Osmose, Inc.*, 200 Or. App. 699, 707 (2005) (noting that an implied warranty of fitness for a particular purpose cannot qualify as a warranty of future performance because it is neither explicit nor future oriented). A contract need not use the term "warranty," however, to create a warranty of future performance. Rather, the definition of express warranty includes any description of the goods, affirmation of fact, or promise that becomes part of the basis of the bargain. *Hunter*, 208 Or.

App. at 246-47; *see* O.R.S. § 72.3130 (defining express warranty and stating that it "is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty . . . .").

"In addition to being an express warranty, a warranty of future performance must 'explicitly extend to future performance' and 'discovery of the breach must await the time of such performance.'" *Hunter*, 208 Or. App. at 247 (citing O.R.S. § 72.7250(2)). "Both requirements are essential; the mere fact that a breach of the warranty would be impossible to discover at the time of delivery is not itself sufficient to create a warranty of future performance." *Id.* For example, in *Gladhart*, the plaintiffs purchased grapevines that the sellers described as "[Disease] Free." *Gladhart*, 164 Or. App. at 460. The Oregon Court of Appeals held that that statement did not constitute a warranty of future performance because, although discovery of the defect would necessarily require waiting for the vines to develop, there was nothing in the language of the warranty from which the Court could infer that it extended to future performance. Instead, the language merely warranted that the plants were not contaminated at the time of the sale. *Id.* at 461.

Defendant argues that it made only the following one-year express warranty:

> Our obligation under this warranty is limited to repairing or replacing at our option at our factory any product which shall within one year after delivery to original buyer be returned with transportation charges prepaid, and which upon examination shall show to our satisfaction to have been defective.

The parties do not dispute that Plaintiff failed to notify Victaulic of any product defects within the required one-year period. The parties also do not dispute that the Victaulic Products installed in the Benson Towers were delivered to JRT in February of 2007. Accordingly, Defendant argues that Plaintiff was required to notify Victaulic of any product defects no later than February 2008 pursuant to the terms of this express warranty. The Court agrees. *See Clemens v.*

*DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("The general rule is that an express warranty does not cover repairs made after the applicable time . . . periods have elapsed.") (citation omitted).

Plaintiff, however, does not contest Defendant's argument that it failed to bring a warranty claim within this express warranty's one-year period. Instead, Plaintiff argues that Defendant made at least 15 additional express warranties in its product literature or through statements made by Defendant's representatives that contain neither a one-year limitations period nor a disclaimer of damages. Plaintiff correctly notes that a contract need not use the term "warranty," to create an express warranty. *See* O.R.S. § 72.3130. Plaintiff alleges that Defendant made the following statements and that they constitute express warranties:

1. Victaulic's Grade "E" EPDM shall withstand temperatures of 230°F to -30°F.

2. Victaulic's Grade "E" EPDM is recommended for hot water service within the specified temperature range.

3. Victaulic's Grade "E" EPDM is certified for use in potable water systems. Specifically, it is UL classified in accordance with ANSI/NSF 61 for cold +86°F/+30°C and hot +180°F/+82°C.

4. Victaulic's Grade "E" EPDM can be used with chlorine water at 5 ppm max.

5. Victaulic's 600 series couplings and valves are designed for use with copper pipes.

6. Victaulic's 606 coupling has pressure ratings of up to 300 psi/2065 kPa.

7. Victaulic's 606 coupling comes with Grade "E" EPDM.

8. Victaulic's 607 coupling comes with Grade "E" EPDM.

9. Victaulic's 608 butterfly valves are designed to provide bubble-tight shut-off to 300 psi (2065 kPa).

10. Victaulic's 608 butterfly valves come with Grade "E" EPDM.

11. Victaulic Products can be used in buildings in Portland, Oregon.

PAGE 14 – OPINION AND ORDER

12.    Victaulic Products were suitable for installation in potable water systems in Portland, Oregon.

13.    The "EHP" EPDM in the replacement Victaulic 607 couplings would perform adequately in Portland, Oregon.

14.    Victaulic Products are free from defects in materials and workmanship.

15.    Victaulic Products have a useful life of at least forty (40) years.

In addition to its statute of limitations argument, Defendant further argues that: (1) Plaintiff provides no evidence that any of the claimed express warranties formed the basis of the bargain for the purchase of Victaulic products; (2) that Victaulic's product literature expressly disclaims any warranties other than its express one-year "repair or replace" warranty; and (3) that product information provided in Victaulic literature does not support a warranty claim. The Court need not address Defendant's latter two arguments, however, because any claim for breach of these warranties is either time-barred or unsupported by any evidence indicating that the statements formed the basis of the bargain between the parties.

The first "additional" 14 express warranties allegedly made by Victaulic contain no language that "explicitly extend[s] to future performance." *Hunter*, 208 Or. App. at 247 (citing O.R.S. § 72.7250(2)). Accordingly, those 14 warranties are not warranties of future performance and, under O.R.S. § 72.7250(2), any claims related to these alleged express warranties accrued upon delivery of the Victaulic products in February 2007. Thus, under O.R.S. § 72.7250(1), those claims were time-barred no later than February 2011, which is four years after the Victaulic Products were delivered. Because the present action was filed in July 2013, more than two years after the expiration of the relevant statute of limitations, claims under these 14 express warranties are time-barred.

PAGE 15 – OPINION AND ORDER

Unlike the other 14 express warranties allegedly made by Defendant, the fifteenth statement, "Victaulic's Products have a useful life of 40 years," would likely qualify as a warranty of future performance as defined by O.R.S. § 72.7250(2). Accordingly, a claim under this express warranty would not be time-barred, as the warranty would extend for 40 years from delivery of the Victaulic products in February 2007. There are, however, two prerequisites to a claim for creation of an express warranty. *Larrison v. Moving Floors, Inc.*, 127 Or. App. 720, 724 (1994). First, there must be an affirmation of fact or description of the goods by the seller. *Id.* Second, that factual affirmation or description must be the "basis of the bargain." *Id.*; O.R.S. § 72.3130(1)(a). Privity of contract is not required. *Dravo Equip. Co. v. German*, 73 Or. App. 165, 169-70 (1985). To form the basis of the bargain, a seller "need only introduce it into the bargaining process." *Autzen v. John C. Taylor Lumber Sales, Inc.*, 280 Or. 783, 788-89 (1977).

Plaintiff's argument that an additional express warranty exists fails at both steps. Plaintiff offers only the testimony of Kevin Simko, a Victaulic employee, to support its claim that Victaulic made the affirmative statement: "Victaulic products have a useful life of at least forty (40) years." Mr. Simko's testimony, however, reveals only that Victaulic expected that the Victaulic Products in question had a useful life of 40 years. Plaintiff provides no evidence that this statement was ever made or communicated to any relevant purchaser or user of Victaulic's Products such that it could be found to have been made to Plaintiff (directly or indirectly) or otherwise introduced into the bargaining process. *See Autzen*, 280 Or. at 788-89; *Hunter*, 208 Or. App. at 250 (holding that where Plaintiff alleged that sales representative's specific statements formed the basis of the bargain and Defendant denied statements were made, disputed issue was one of fact for the jury). Absent some evidence that the statement that "Victaulic's Products have a useful life of 40 years" was expressed to anyone in Plaintiff's chain of distribution or otherwise

formed the basis of the bargain between the parties, Plaintiff cannot demonstrate that this particular alleged express warranty was ever created.

## 2. Tolling of the Statute of Limitations

Plaintiff attempts to revive its time-barred breach of warranty claim by arguing that the statute of limitations was tolled due to Defendant's fraudulent concealment of the product defects. Under the fraudulent concealment doctrine, a statute of limitations is tolled when the defendant "wrongfully conceals material facts and thereby prevents discovery of his wrong or of the fact that a cause of action has accrued against him," and the statute does not begin to run until the plaintiff discovers, or should discover, the existence of the cause of action. *Chaney v. Fields Chevrolet Co.*, 264 Or. 21, 27 (1972); *see also Waxman v. Waxman & Associates, Inc.*, 224 Or. App. 499, 512 (2008). "[The plaintiff] carries the burden of pleading and proving fraudulent concealment; it must plead facts showing that [the defendant] affirmatively misled it, and that [the plaintiff] had *neither actual nor constructive knowledge* of the facts giving rise to its claim despite its diligence in trying to uncover those facts." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (alteration in original) (quotation marks and citation omitted). "A fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983). A plaintiff is deemed to have had constructive knowledge if he or she had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the cause of action. *Ryan v. Ford Motor Co.*, 15 F.3d 1089, 1994 WL 19047 (9th Cir. 1994).

Plaintiff argues that it has demonstrated fraudulent concealment based on allegations of fraud that involve non-disclosure of material information. Plaintiff, however, misunderstands the

doctrine of fraudulent concealment. The mere fact that Plaintiff has adequately pleaded fraud does not import a discovery rule into the statute of limitations for a related breach of warranty claim. "Fraudulent concealment in the pertinent sense involves concealment of the fact that a cause of action has accrued against the defendant." *Classen v. Arete NW, LLC*, 254 Or. App. 216, 226 (2012) (internal citation omitted). The claim at issue here sounds in contract, and O.R.S. § 72.7250(2) provides that a breach of warranty claim accrues when tender of delivery is made, which in this case, was not later than February 2007.

Plaintiff does not allege in this action that Defendant concealed the fact that a cause of action had accrued. Moreover, Plaintiff has provided the Court with no evidence of any actions by Victaulic that would have prevented Plaintiff from discovering defects in the Victaulic products. In fact, Plaintiff even states that it found defective Victaulic Products as early as September of 2010, and further alleges that it made a warranty claim at that time,[3] well within the four-year statute of limitations for a breach of warranty claim under O.R.S. § 72.7250(2), demonstrating that the facts necessary to bring a claim for breach of warranty were not concealed from it.[4]

### 3. Waiver

Plaintiff also argues that Victaulic intentionally waived any limitations in its express warranty by: (1) continuing to sell products in Portland despite knowledge that those products were defective; (2) improperly denying Plaintiff's 2010 warranty claim; and (3) failing to

---

[3] As explained below, however, Plaintiff's only evidence of this warranty claim rests on inadmissible hearsay.

[4] At oral argument, Plaintiff asked the Court to review the Fifth Circuit's discussion of fraudulent concealment in *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174 (5th Cir. 1988). The Court has reviewed that decision and finds nothing that changes this analysis.

respond substantively to Plaintiff's May 2012 statutory "701 notice"[5] requesting that Victaulic cure the product defects. Victaulic's alleged continued sale of defective Victaulic Products in Portland, despite knowledge that those products were defective, is a claim sounding in fraud, and does not support an argument for intentional waiver of limitations in an express warranty. Moreover, Plaintiff provides no explanation or authority for the claim that Victaulic's continued sale of defective products to third parties waives the limitations period applicable to Victaulic's express warranty to Plaintiff. Further, Plaintiff's May 2012 notice to Victaulic is irrelevant, because Plaintiff failed to notify Victaulic of any defects within the express warranty's one-year period, and in any event, a claim for breach of that warranty would be time-barred by February 2011 under the applicable four-year statute of limitations provided by O.R.S. § 72.7250(1).

The argument that Defendant's denial of Plaintiff's 2010 warranty claim, or more accurately statements made by Victaulic in denying that claim, waived certain limitations in Defendant's express warranty is plausible. On a motion for summary judgment, however, Plaintiff must provide evidence substantiating its allegations. Plaintiff's only evidence to support this claim is the testimony of David Berg, an employee of Community Management, Inc. ("CMI"), an association management company hired by Plaintiff. Mr. Berg testified that he learned from certain employees at American Heating, a contractor hired by Plaintiff to perform preventative maintenance on the mechanical systems of the Benson Tower, about Victaulic's warranty of its products. As presented by Plaintiff, according to CMI's Mr. Berg, one or more of the employees from American Heating supposedly spoke with a Victaulic representative named "J.J. Weaks" and the person from American Heating requested that Victaulic pay for

---

[5] As required by O.R.S. § 701.565, Plaintiff sent Victaulic written notice identifying the alleged defective Victaulic products and made the Benson Tower available for inspection by Victaulic.

replacement parts under Plaintiff's warranty. Mr. Weaks supposedly told that person from American Heating that Victaulic denied the warranty claim, and this person from American Heating supposedly told another person at American Heating, who then relayed that information to Mr. Berg of CMI, acting as Plaintiff's agent.[6]

Defendant argues that, even if statements made by an employee when denying a warranty claim could intentionally waive the limited period applicable to Victaulic's express warranty, Mr. Berg's statement is inadmissible hearsay. The Court agrees. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls under a hearsay exception under Rules 803, 804 or 807. *See* Fed. R. Evid. 802. Here, Mr. Berg's testimony is offered to prove that a warranty claim was made by American Heating on behalf of Plaintiff, and Plaintiff has not argued that these statements fall under any hearsay exception. Accordingly, Plaintiff has presented no admissible evidence supporting its claim that Victaulic waived the limitations of its express warranty.

### 4.   Failure of Essential Purpose

Finally, Plaintiff argues that, to the extent Victaulic's disclaimer of warranties is enforceable, that warranty has failed of its essential purpose. O.R.S. § 72.7190(2) provides that "where circumstances cause an exclusive or limited remedy to fail of its essential purpose remedy may be had as provided in the Uniform Commercial Code." *See also Young*, 99 Or. App. at 267 (citing O.R.S. § 72.7190 cmt. 1) ("If the jury finds that a buyer limited his remedies in a

---

[6] In his deposition, Mr. Weaks denied that he ever received such a warranty claim from Plaintiff, and Plaintiff offers no documentary evidence of any such warranty claim having been submitted to Victaulic.

sales contract and then lost the substantial value of the bargain when the limited remedy failed, the remedy has failed of its essential purpose.").

The Court need not determine whether Victaulic's limited one-year warranty fails of its essential purpose, however, because even if the limited warranty did fail of its essential purpose, the claim is still time-barred. O.R.S. § 72.7250(1) provides a four-year statute of limitations for breach of warranty claims. Any claim for breach of this warranty accrued in February 2007 upon delivery of the Victaulic products. Plaintiff did not file the present action until June 17, 2013. Accordingly, even if Victaulic's limited warranty had failed of its essential purpose, any remedy available to defendant under the Uniform Commercial Code would be time-barred.

**C. Fraud**

Defendant moves for summary judgment on Plaintiff's claim for fraud, arguing that Plaintiff has failed to present specific evidence that JRT (or anyone else in the chain of distribution of the Victaulic Products) relied on any specific, material representations made by Defendant. Plaintiff responds that it has provided sufficient evidence to demonstrate that JRT, the plumber responsible for the original purchase and installation of the Victaulic products in Plaintiff's water system, heard and relied upon material "half-truths" made by Victaulic representatives. Plaintiff additionally maintains that it has a valid fraud claim based on affirmative misrepresentations made by Victaulic in denying Plaintiff's 2010 warranty claim.

**1. Law Governing Fraud**

Under Oregon law, a plaintiff must prove the following elements to prevail on a claim of fraud: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury." *Or. Pub. Emps.'*

*Ret. Bd. ex rel. Or. Pub. Emps.' Ret. Fund v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 424

(2004) (citation and quotation marks omitted).  A fraud claim can be based on either an

affirmative misrepresentation or, in some circumstances, active concealment or nondisclosure.

*See Ogan v. Ellison*, 297 Or. 25, 34 (1984); *Gregory v. Novak*, 121 Or. App. 651, 655 (1993).

When fraud is based on silence or nondisclosure, a party must "demonstrate that the defendant

either (1) remained silent when they had a duty to speak,[7] or (2) assumed the obligation to make

a full and fair disclosure of the whole truth by making a representation in the nature of a 'half-

truth.'" *Smith v. U.S. Bank, N.A.*, 2011 WL 7628515 at *6 (D. Or. Oct. 26, 2011) (footnote

added), *report and recommendation adopted* 2012 WL 1029364 (D. Or. Mar. 26, 2012); *see also*

*McFadden v. Dryvit Sys., Inc.*, 2004 WL 2278542 (D. Or. Oct. 8, 2004) (reasoning that "silence

or concealment of facts can be the basis for a fraud action, especially when there are half-truths

or misleading statements"); *Gregory*, 121 Or. App. at 655 (holding that "one who makes a

representation that is misleading because it is in the nature of a 'half-truth' assumes the

obligation to make a full and fair disclosure of the whole truth").[8]

---

[7] A duty to speak or disclose exists when there is a special relationship between a plaintiff and a defendant. *Gardner v. First Escrow Corp.*, 72 Or. App. 715, 720 (1985). When a special relationship exists, "the defendant has a duty to disclose to the plaintiff all material matters of which the defendant had knowledge." Oregon Uniform Civil Jury Instruction No. 42.03; *see also Gebrayel v. Transamerica Title Ins. Co.*, 132 Or. App. 271, 281 (1995). A special relationship exists when the plaintiff has authorized the defendant to exercise independent judgment on the plaintiff's behalf and the defendant has accepted this responsibility. *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 160-62 (2001). A special relationship does not exist if the parties were merely in an "arm's-length" commercial or business relationship where they were acting in their own economic interest. *See Conway v. Pacific Univ.*, 324 Or. 231, 239-41 (1996); *see also Moore Excavating, Inc. v. Consol. Supply Co.*, 186 Or. App. 324, 333 (2003). Plaintiff has not alleged any special relationship relevant to this case.

[8] *See also* Oregon Uniform Civil Jury Instruction No. 42.04 ("When a defendant makes a representation to a plaintiff in the nature of a half-truth, the failure of a defendant to make a full and fair disclosure of the truth may be a false representation."); *Krause v. Eugene Dodge, Inc.*, 265 Or. 486, 505 (1973) (same).

To establish reliance in a fraud cause, Oregon courts have held that "[d]irect evidence of reliance in support of a fraud claim is not required; a plaintiff may prevail on a showing that a reasonable inference of reliance can be drawn from the facts in evidence." *Wieber v. FedEx Ground Packaging Sys., Inc.*, 231 Or. App. 469, 483 (2009) (citing *Strawn v. Farmers Ins. Co.*, 228 Or. App. 454, 470 n.9 (2009)). Moreover, a representation need not be made directly to a plaintiff for the representation to be actionable. *Johnsen v. Mel-Ken Motors, Inc.*, 134 Or. App. 81, 90 (1995). In certain circumstances, reliance can be derivative—*i.e.*, made through another person on whom the injured party reasonably relied, who in turn reasonably relied on the false representation. *See Handy v. Beck*, 282 Or. 653, 659-65 (1978). It is, therefore, sufficient to show that the defendant "made a representation to [a third party] with the intention that it be communicated to and acted upon by the plaintiff." *Johnsen*, 134 Or. App. at 90.

In cases involving half-truths, the reliance element of a fraud claim is more complex. In *Hynix Semiconductor Inc. v. Rambus Inc.*, the Northern District of California addressed at summary judgment the issue of establishing reliance in the context of a half-truth under California's fraud law.[9] 2007 WL 4209399 (Nov. 26, 2007). The court reasoned that "[o]rdinarily, one must prove that one read or heard a misrepresentation to have relied on it," but "[o]n the other hand, an omission is never conveyed, making it impossible for one to hear or read it." *Id.* at *7. The court further reasoned that "the half-truth calculated to deceive likely puts the one who hears it at ease," but that it "is the omitted portion of the half-truth that would have led a person to behave differently." *Id.* The court added that, given this dynamic, "to establish reliance in a case premised on 'half-truths,' a plaintiff must show that they heard the half-truth, but can be

---

[9] For purposes of the pending motion, California's law of fraud is substantially similar to Oregon's law.

found to have relied on it if they would have behaved differently 'had the omitted information been disclosed.'" *Id.*

The reasoning in the *Hynix* case is consistent with Oregon fraud law. *Cf. Gregory*, 121 Or. App. at 655; *Heise v. Pilot Rock Lumber Co.*, 222 Or. 78, 89-90 (1960). Therefore, in order adequately to demonstrate fraud based on a half-truth made by Victaulic, Plaintiff must show that a relevant person: (1) heard the half-truth; and (2) would have "behaved differently had the omitted information been disclosed." *See Hynix*, 2007 WL 4209399, at *7.

### 2.  Plaintiff's Evidence of Reliance or "Hearing the Half-Truth"

In its Second Amended Complaint, Plaintiff alleges that JRT, the plumber responsible for the original purchase and installation of the Victaulic products, heard and relied upon material half-truths made by Victaulic representatives. Specifically, Plaintiff alleges that despite knowledge that Victaulic products containing EPDM would prematurely degrade when exposed to chloramines, Victaulic engaged in a pattern and practice of regularly approaching local plumbers, contractors, and developers in Portland, Oregon in an attempt to convince those entities to use or purchase products that contain EPDM instead of other plumbing products. Second Am. Comp. at ¶¶ 76-77 (Dkt. 78). Plaintiff further alleges that JRT relied on representations made in Victaulic's Seal Selection Guides, Field Installation Handbooks, Design and Installation Manual, and Product Catalogs stating that that the Victaulic products installed in the Benson Towers would be suitable for that type of project. *Id.* at ¶¶ 15, 78.

In response to Defendant's Motion for Summary Judgment, however, Plaintiff's only evidence to support these contentions of reliance is the testimony of Gary Ritola, the JRT project foreman for the construction of the Benson Tower. Mr. Ritola makes the following relevant statements in his testimony: (1) that he was personally involved in the purchase of at least some of the Victaulic products installed in the Benson Tower's water system; (2) before and during the

construction of Benson Tower, Victaulic employees conducted on-site visits and trainings with JRT employees; (3) that, in attempting to sell JRT the type of products used in Benson Tower, Mr. Ritola believed that Victaulic was representing that those products were suitable for use with projects involving the Portland water supply; (4) that he was comfortable using Victaulic products because he had reviewed Victaulic's specifications and product literature and because Victaulic had an active sales presence in Portland; (5) that he relied upon his interactions with Victaulic's representatives as representations that Victaulic's products were suitable for use in Portland; and (6) that he would not have purchased the Victaulic products if Victaulic had told him they were not suitable for use with the Portland water supply.

Plaintiff contends that Mr. Ritola's statements are sufficient to create a disputed issue of material fact as to whether JRT relied upon Victaulic's alleged half-truths. Plaintiff, however, does not identify any specific half-truth allegedly stated by Defendant to Mr. Ritola. As the Court in *Hynix* noted, "the half-truth calculated to deceive likely puts the one who hears it at ease," but that it "is the omitted portion of the half-truth that would have led a person to behave differently." 2007 WL 4209399, at *7. Here, Plaintiff has not identified any specific statement from Victaulic's product literature or from Victaulic's representatives that could have put Mr. Ritola "at ease." Mr. Ritola was unable to recall any specific statement made by Victaulic employees or any specific representation made in Victaulic's product literature that he heard and relied upon. Instead, Mr. Ritola's testimony demonstrates only a general "comfort" with the use of Victaulic products. A half-truth, however, must be in the nature of a reasonable inference from an affirmative statement. *See* Donald C. Langevoort, *Half-Truths: Protecting Mistaken Inferences by Investors and Others*, 52 Stan. L. Rev. 87, 93 (1999) ("[T]he law of half-truths is all about determining what, if any, implication follows from one party's statements that would

entitle the other party to rely without seeking further clarification."). Without a specific identifiable affirmative statement, there is no basis to find that any inference made by Mr. Ritola was reasonable.

The Oregon Court of Appeals decision in *Gregory* is instructive. There, the defendant sold a condominium complex to the plaintiff and affirmatively represented that the pool was "in working order." *Gregory*, 121 Or. App. at 655. The plaintiff brought a claim for fraud against the defendant, arguing that the defendant's representation that the pool was in working order was a half-truth, which reasonably implied that the pool was leak-proof. *Id.* The defendant responded that it had no duty to disclose any defects, and therefore its silence did not constitute a representation. On these facts, the Oregon Court of Appeals held that there was a disputed issue of material fact regarding whether the defendant's representations were misleading with respect to the pool's specific alleged defects. *Id.*

Unlike the plaintiff in *Gregory*, however, Plaintiff can point to no specific affirmative statement made by Defendant that could give rise to a reasonable implication that the specific Victaulic products at issue in this case were suitable for use in the Benson Tower's potable water system. Perhaps in anticipation of this problem, Plaintiff directs the Court to portions of Mr. Ritola's testimony in which Mr. Ritola claims that he "relied" upon Victaulic's statements and would not have used Victaulic's products if he had known that they would degrade when exposed to Portland water. This, however, places the cart before the horse: Before evidence that a person "would have behaved differently" is relevant to the inquiry, Plaintiff must demonstrate that some person actually heard the half-truth itself. *See Hynix*, 2007 WL 4209399, at *7. That half-truth must be in the nature of an affirmative statement that gives rise to a reasonable, but erroneous inference. *Id.*; *Gregory*, 121 Or. App. at 655. Because Plaintiff has provided no

evidence that Mr. Ritola ever heard any such affirmative, half-truth statement, Defendant is

entitled to summary judgment on Plaintiff's fraud claims premised on half-truths.

### 3.    Fraud Based on Affirmative Misrepresentations

In its Second Amended Complaint, Plaintiff also asserts a claim for fraud based on

affirmative misrepresentation. Specifically, Plaintiff alleges that when the Victaulic products

installed in Benson Towers failed in 2010, Plaintiff submitted a warranty claim to Victaulic.

Second Am. Comp. ¶¶ 30-32. Plaintiff further alleges that when this warranty claim was denied,

Victaulic falsely claimed that the Victaulic products were subjected to unknown adverse "system

conditions" outside of the recommended uses. *Id.* at ¶¶ 30-31. Plaintiff alleges that Victaulic

knew that its products were defective and that Victaulic's misrepresentations and failure to

disclose material facts "caused Plaintiff to purchase and replace defective Victaulic products

with additional defective Victaulic products, causing additional and progressive damages to the

condominium." *Id.* at ¶ 31.

On summary judgment, Defendant argues that Plaintiff has no evidence that any warranty

claim was filed in 2010. Plaintiff's only evidence that a warranty claim was filed with Victaulic

is the testimony of David Berg.[10] As explained above, Mr. Berg's testimony on this matter is

_____

[10] At his deposition, Mr. Berg stated:

> [an American Heating employee] told me that another employee of
> theirs named Neal [Morgavi] … had spoken to a gentleman from
> Victaulic by the name of J.J. Weaks and he said, "look, we've been
> working in the building, and we replaced some valves that had
> failed and kind of surprised us because they were so new. So
> would you like to treat this as a warranty?" And what they told me
> is that Victaulic responded … "No. This is a legal issue. We're not
> going to touch it." And so American Heating came back to us and
> said, "look, we can't get a freeby, so we've got to charge you for
> these." So they went and purchased them. I don't know from
> which supply house or where.

inadmissible hearsay under Fed. R. Evid. 801(c). Accordingly, the Court grants summary judgment for Defendant on Plaintiff's fraud claim.

## D.  Punitive Damages

O.R.S. § 30.925 sets out the comprehensive standard in Oregon for punitive damages in products liability actions, which include claims of strict liability, negligence, and fraud. *See Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1335 (9th Cir. 1985) (discussing application of O.R.S. § 30.925 factors in products liability actions). Under Oregon law, "[p]unitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." O.R.S. § 31.730(1). "[S]imple negligence, without more, cannot support an award of punitive damages, where the evidentiary record supports findings of both negligence and the additional factors of aggravated misconduct requisite for award of punitive damages, a punitive damages award may lie in connection with a negligence claim." *Jane Doe 130 v. Archdiocese of Portland in Oregon*, 717 F. Supp. 2d 1120, 1140 (D. Or. 2010) (citing O.R.S. § 31.730(1)). Moreover, under Oregon law "[i]t is well-established that whether a defendant's conduct is aggravated or wanton or comes within any of the other characterizations that permit the imposition of punitive damages is for the jury to decide, as long as there is evidence upon which the finding can be based." *Id.* at 1140 (citing *Schmidt v. Pine Tree Land Dev.*, 291 Or. 462, 466 (1981)).

In cases involving company defendants, such as Victaulic, "punitive damages serve the function to deter enterprises from accepting the risks of harming other private or public interests by recklessly substandard methods of operation at the cost of paying economic compensation to those who come forward to claim it." *Ibanez v. Bettazza*, 2013 WL 1295219, at *5 (D. Or. Mar.

28, 2013) (citing *Schmidt*, 291 Or. at 466). To justify an award of punitive damages against a company, however, the company's "conduct must go beyond mere carelessness to a willful or reckless disregard of risk of harm to others of a magnitude evincing a high degree of social irresponsibility." *Id.* The decisions of such institutional defendants "may well be wholly impersonal with respect to any victim, indeed conducted with the hope that no harm will occur, and they may not involve a culpable attitude on the part of any one person responsible for the management of the enterprise; yet … such lack of managerial culpability alone does not foreclose punitive damages." *Andor by Affatigato v. United Air Lines, Inc.*, 303 Or. 505, 514 (1987) (quoting *Schmidt*, 291 Or. at 446).

Plaintiff provides evidence of Defendant's alleged aggravated misconduct through the testimony of three Victaulic employees: (1) Kevin Simko, Victaulic's manager of engineering services for North America; (2) Catsy Lam, a Victaulic material sciences technical leader; and (3) Lawrence W. Thau, Victaulic's executive vice-president and chief technical officer.

Mr. Simko testified that he was responsible for providing Victaulic's customers with technical information concerning Victaulic products and for adjudicating warranty claims on behalf of the company. Mr. Simko stated that Victaulic was aware of degradation of EPDM in certain Victaulic products as early as 2005. Mr. Simko was also aware that exposure to chloramine was one potential cause of this degradation.

Ms. Lam was responsible for developing new products for Victaulic and analyzing claims made against the company for allegedly defective Victaulic products. Ms. Lam testified that Victaulic was aware of information published as early as 1990 suggesting that chloramines would have a detrimental effect on certain formulations of EPDM. She explained that when chloramines attack EPDM, the rubber can become softer and break into black particles. Ms. Lam

further testified that she began research into the effects of chloramine on EPDM rubber after the company became aware that some municipalities had begun using chloramine instead of chlorine in their water supply. Ms. Lam stated that her research indicated five potential causes of degradation of EPDM rubber in Victaulic products: copper ions, oxygen, temperature, water velocity, and water additives such as chloramine.

Mr. Thau testified that sometime before 2004, Victaulic became aware of the potential deleterious effects of chloramine on EPDM rubber as a result of research published by the American Water Works Association. After the publication of this paper, Victaulic became aware of possible defects in Victaulic's products resulting from chloramine exposure. Mr. Thau also testified that he instructed Mr. Simko to analyze warranty claims received by Victaulic to determine if there was an increase in warranty claims in areas that use chloramine in their water supply. Mr. Thau explained that although this analysis revealed no link between chloramines and problems with Victaulic's Products, he was aware of Ms. Lam's research demonstrating that there was some relation between chloramine exposure and EPDM degradation.

When viewed in the light most favorable to the non-moving party, this evidence raises a genuine dispute of material fact regarding whether Defendant's conduct in and before 2007 of selling the Victaulic Products (containing EPDM) into markets known to use chloramines in its municipal water supply (such as Portland's) without making further disclosures justifies an award of punitive damages. Plaintiff has presented evidence that Victaulic was aware that EPDM could prematurely degrade when exposed to chloraminated water and that certain municipalities (including Portland) added chloramine to their potable water. Plaintiff's evidence suggests that Defendant knew of this defect in its products and deliberately chose not to inform its customers, potential customers, or even its own local sales representatives, while continuing knowingly to

PAGE 30 – OPINION AND ORDER

sell allegedly defective products in markets (such as Portland's), where Defendant's products were susceptible to premature degradation in chloraminated water. A factfinder reasonably could find on these facts that Defendant's conduct indicates the necessary "reckless and outrageous indifference" necessary to support a finding of punitive damages under O.R.S. § 31.730(1). Accordingly, Defendant's motion to strike is denied.

## CONCLUSION

Defendant's Motion for Summary Judgment (Dkt. 89) is GRANTED IN PART and DENIED IN PART. Plaintiff's Motion to Strike Punitive Damages (Dkt. 82) is DENIED.

**IT IS SO ORDERED**.

DATED this 15th day of October, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge