IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BENSON TOWER CONDOMINIUM OWNERS ASSOCIATION**, an Oregon nonprofit corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>**VICTAULIC COMPANY**, a foreign corporation,<br><br>        Defendant. | Case No. 3:13-cv-01010-SI<br><br>**OPINION AND ORDER** |

**Michael H. Simon, District Judge.**

Plaintiff, Benson Tower Condominium Owners Association ("Plaintiff" or "Association"), brought this action against Defendant, Victaulic Company ("Defendant" or "Victaulic"), as the manufacturer of allegedly defective plumbing products installed in the Benson Tower Condominium ("Benson Tower"). On January 15, 2015, following an eight-day trial, the jury returned a verdict in favor of Plaintiff on its products liability claim and awarded Plaintiff $2,045,228 in damages. The jury found against Plaintiff on its claim for negligence and did not award punitive damages. Before the Court are three post-trial motions: (1) Plaintiff's Motion for Reasonable Expenses, Including Attorney's Fees (Dkt. 281), in which Plaintiff seeks

under Rule 37(c)(2) "an award of $1,019,280, including but not limited to $857,537.58 in

attorneys' fees, $21,621.44 in reasonably incurred costs,[1] and $140,120.98 in expert fees and

costs" for Defendant's allegedly improper denial of Plaintiff's requests that Defendant admit that

its products were defective; (2) Defendant's Renewed Motion for Judgment as a Matter of Law

(Dkt. 299); and (3) Defendant's Motion for New Trial (Dkt. 301). For the reasons that follow, all

three post-trial motions are DENIED.

## STANDARDS

### A.  Attorneys' Fees for Failure to Admit

Under Fed. R. Civ. P. 36(a)(1), "[a] party may serve on any other party a written request

to admit, for purposes of the pending action only, the truth of any matters within the scope of

Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either, and

(B) the genuineness of any described documents." The scope of Rule 26(b)(1) includes

"discovery regarding any nonprivileged matter that is relevant to any party's claim or defense,"

which "need not be admissible at the trial if the discovery appears reasonably calculated to lead

to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

When served with a request for admissions, a party must answer or object to the request.

*See* Fed. R. Civ. P. 36(a)(3). The party may not treat the request as "a mere procedural exercise

requiring minimally acceptable conduct" and must provide "full and efficient discovery, not

evasion and word play."*Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936 (9th Cir. 1994). If the

party cannot admit or deny a matter, its answer must "state in detail" why.

Fed. R. Civ. P. 36(a)(4). If the party objects to a request, its answer must state the grounds for the

---

[1] In Plaintiff's post-trial motion, Plaintiff's request for costs in the amount of $21,621.44
does not include any amount requested in Plaintiff's Amended Bill of Costs (Dkt. 328), which is
addressed separately.

objection. Fed. R. Civ. P. 36(a)(5). "The requesting party may move to determine the sufficiency of an answer or objection. Unless the court finds an objection justified, it must order that an answer be served." Fed. R. Civ. P. 36(a)(6).

A party may be sanctioned under Rule 37(c)(2) for failure to comply with Rule 36(a). Rule 37(c)(2) provides:

> If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof.

The rule requires an award of expenses unless the court finds one of the following exceptions applies:

> (A) the request was held objectionable under Rule 36(a); (B) the admission sought was of no substantial importance; (C) the party failing to admit had reasonable ground to believe that the party might prevail on the matter; or (D) there was other good reason for the failure to admit.

Fed. R. Civ. P. 37(c)(2). The ultimate goal of Rule 37(c)(2), like the Federal Rules of Civil Procedure generally, is "to secure the just, speedy, and inexpensive determination of every action." *Marchand*, 22 F.3d at 936 (quoting Fed. R. Civ. P. 1). Rule 37(c)(2) "mandates an award of expenses unless an exception applies" and therefore "encourages attorneys and parties to identify undisputed issues early to avoid unnecessary costs. Failure to identify those issues wastes the resources of parties and courts." *Id.* "[T]he true test under Rule 37(c) is not whether a party prevailed at trial but whether he acted reasonably in believing that he might prevail." *Id.* at 937 (citing Fed. R. Civ. P. 37(c), Advisory Committee Notes on 1970 Amendment).

## B.  Judgment as a Matter of Law

Judgment as a matter of law is proper if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy*

*Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quotation marks omitted); *see also Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (explaining that judgment as a matter of law must be granted if it is clear that "the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party"). Because a motion under Rule 50(b) is a renewed motion, a party cannot "raise arguments in its post-trial motion for judgment as a matter of law that it did not first raise in its Rule 50(a) pre-verdict motion." *Go Daddy Software*, 581 F.3d at 961 (quotation marks omitted).

In evaluating a motion for judgment as a matter of law, the Court must view all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Experience Hendrix, L.L.C., v. Hendrixlicensing.com, Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). The Court may not, however, make credibility determinations, weigh the evidence, or "substitute its view of the evidence for that of the jury." *Krechman v. City of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (quotation marks omitted). A jury's verdict must be upheld if it is supported by substantial evidence. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014); *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). Substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion[,] even if it is possible to draw two inconsistent conclusions from the evidence." *Weaving*, 763 F.3d at 1111 (quotation marks omitted).

## C.  New Trial

The Court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation marks omitted); *see also Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007). Unlike a Rule 50 determination, the Court is not required to view the evidence in the light most favorable to the non-moving party.

PAGE 4 – OPINION AND ORDER

*Experience Hendrix*, 762 F.3d at 842. Rather, the Court "can weigh the evidence and assess the credibility of the witnesses." *Id.* (citing *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam)). A judge should not award a new trial unless he is "left with the definite and firm conviction that a mistake has been committed." *France Telecom S.A. v. Marvell Semiconductor Inc.*, 2015 WL 925892, at *1 (N.D. Cal. Mar. 2, 2015) (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987)).

## DISCUSSION

### A.  Plaintiff's Motion for Reasonable Expenses, Including Attorneys' Fees

In August 2013, Plaintiff propounded 64 requests for admission ("RFA") to Defendant in its First Set of Requests for Admissions. Dkt. 282-6. Pursuant to Fed. R. Civ. P. 36(a), Defendant responded to these inquiries. *Id.* Plaintiff contends that Defendant's responses to Plaintiff's RFA nos. 9, 11, 27, 28, 39, 49, and 59 (the "Disputed RFAs") were improper under Fed. R. Civ. P. 37(c)(2), and as a result, Plaintiff expended considerable time and resources during the course of litigation to "prove matters that Victaulic could have and should have admitted."

The Disputed RFAs requested that Defendant admit the following:

> RFA No. 9: Admit that the EPDM used by Victaulic in Victaulic 608 Series valves manufactured between 2000 and 2011 were defective because the EPDM deteriorates and/or degrades when exposed to chloramines.

> RFA No. 11: Admit that the Victaulic 608 Series valves containing EPDM that were installed in the Subject Property are defective.

> RFA No. 27: Admit that as a consequence of the susceptibility of EPDM contained within the Victaulic 608 Series valves to deteriorate and degrade when exposed to chloramines, the Victaulic 608 Series valves are inherently defective.

> RFA No. 28: Admit that the Victaulic Series 608 valves are defective because the EPDM used in those valves deteriorates and/or degrades when exposed to chloramines.
>
> RFA No. 39: Admit that the Victaulic 606 Series couplings containing EPDM installed in the Subject Property are defective.
>
> RFA No. 49: Admit that the deterioration and/or degradation of the EPDM contained within the Victaulic 606 Series couplings becomes progressively worse over time when exposed to chloramines.
>
> RFA No. 59: Admit that as a consequence of the susceptibility of the EPDM contained within the Victaulic 606 Series couplings to deteriorate and degrade when exposed to chloramines, the Victaulic 606 Series couplings are defective.

As to each of the Disputed RFAs, Defendant responded with multiple and lengthy objections, as well as partial admissions or denials. Each of the matters that Plaintiff requested Defendant admit was, however, proved true at trial. Now, in response to the present motion, Defendant argues that Plaintiff should not be awarded fees under Rule 37(c)(2) because: (1) the Disputed RFAs were objectionable under Rule 37(c)(2)(A) on the grounds that the RFAs ask for "purely legal conclusions"; and (2) under Rule 37(c)(2)(C), Defendant had reasonable grounds to believe that it might prevail at trial. The Court addresses each argument in turn.

### 1. Whether Plaintiff's Requests for Admission Were Objectionable

Defendant argues that all of the Disputed RFAs were objectionable because they ask for purely legal conclusions. Specifically, Defendant argues that a request for admission regarding whether a particular product is "defective" is improper because it involves no more than a request for a conclusion of state law. Plaintiff responds that, to the contrary, the RFAs are reasonable applications of fact to law, and thus are permitted under the Federal Rules.

Fed. R. Civ. P. 36(a)(1)(A) permits requests for admissions as to "facts, the application of law to fact, or opinions about either." Requests for purely legal conclusions, however, are

generally not permitted. *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009) (holding that requests seeking purely legal conclusions are not permitted under Rule 36); *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, 2015 WL 579688, at *2 (N.D. Cal. Feb. 11, 2015) (same); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[I]t would be inappropriate for a party to demand that the opposing party ratify legal conclusions that the requesting party has simply attached to operative facts."). As explained in 7 *Moore's Federal Practice* § 36.10[8] at 36–26 (3d ed. 2008) (footnotes omitted):

> Requests for admission may relate to the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36.

*See also* 8A Charles Wright, Arthur Miller, & Richard Marcus, *Federal Practice and Procedure* § 2255, 534 & n.8 (2d ed. 1994) (citing cases). As noted by other district courts in this circuit, however, "the distinction between the application of law to fact and a legal conclusion is 'not always easy to draw.'" *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2012 WL 4743121, at *2 (N.D. Cal. Oct. 3, 2012) (citing *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 952254, at *3 (N.D. Cal. Mar. 20, 2012)).

Courts that have grappled with this question have attempted to provide guidance. For example, in *Reichenbach v. City of Columbus*, a plaintiff alleging disability discrimination under the Americans with Disabilities Act issued an RFA requesting that the defendants "admit that the curb ramp at issue was not compliant with current federal accessibility design standards." 2006 WL 143552 (S.D. Ohio 2006) at *2. The defendants objected that this request sought only a conclusion of law, and the court agreed. *Id.* A proper request, according to the court, instead might have asked, "Defendants adopted a transition plan within six months of January 26, 1992, as required by 28 C.R.F. 35.150(d)(1). Admit or deny." *Id.* n.3. According to the court in

*Reichenbach*, the former question involves a pure question of law and is thus improper; the latter question applies operative facts to relevant law. *See also Tulip Computers Int'l, B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 108 (D. Del. 2002) (holding that "determining whether a patent is valid would call for a legal conclusion although dependent on factual inquiries"); *Playboy Enters., Inc. v. Welles*, 60 F. Supp. 2d 1050, 1057 (S.D. Cal. 1999) (holding that a defendant may object to an RFA asking her to admit that she is a "public figure" as defined in Supreme Court case law as improperly seeking a purely legal conclusion). A looser or contrary standard would risk undermining the "American Rule" on attorneys' fees, in which each party pays its own attorney fees, at least in the absence of an agreement, statute, or rule to the contrary. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (holding that under the "American Rule," attorneys' fees ordinarily are not recoverable against the losing party in a lawsuit).

Here, the Disputed RFAs are more similar to the RFAs found to be improper by the court in *Reichenbach*. Although Plaintiff has nominally tied its RFAs to the facts of the case, the request remains a legal conclusion: whether or not the Victaulic products are defective under Oregon law. The Disputed RFAs did not specifically request the admission of underlying facts that may be used to establish that the Victaulic products were defective, which may well have been appropriate RFAs. Rather, the Disputed RFAs merely requested the admission of the legal conclusion that the Victaulic products are defective. Under these circumstances, Defendant's objections to the Disputed RFAs were not improper and the Court denies Plaintiff's motion for fees on this basis.

In addition, Plaintiff's failure to bring this dispute before the Court before trial also weighs against granting fees to Plaintiff under Rule 37(c)(2). Although the Ninth Circuit in *Marchand* held that "[i]t would be unduly burdensome to *require* each and every objection to be

challenged in order for sanctions to issue," *id.* at 938 (emphasis added), Plaintiff provides no

explanation for its decision to wait more than 18 months after issuing its RFAs to raise this issue,

or for its decision not bring this dispute to the Court's attention before trial as permitted by

Rule 36(a)(5). *See* 8A Charles Alan Wright and Arthur R. Miller, *Federal Practice and*

*Procedure* § 2290, at 710, n.9 (1994) ("court[s] should consider [an objection] a 'good reason'

for failure to admit and hold that it falls within condition (4) of Rule 37(c)"). *See also Russo v.*

*Baxter Healthcare Corp.*, 51 F. Supp. 2d 70, 79 (D.R.I. 1999) ("The Court finds that the fact that

the objection was not challenged constitutes 'other good reason for failure to admit' under

Rule 37(c)(2)."). Accordingly, the Court finds that Plaintiff's failure to raise this issue at an

earlier time is an additional factor supporting denial of Plaintiff's motion.

### 2. Whether Defendant's Denials Were Reasonable

Defendant also contends that it had a reasonable basis for believing that it would prevail

on the disputed issues in this matter. The court agrees. Although it did not prevail at trial on the

issues involved in the Disputed RFAs, Defendant appears to have had reasonable ground to

believe that it might. Putting aside the above-discussed question of whether the RFAs improperly

requested admissions to purely legal questions, the Disputed RFAs otherwise involved complex

and technical questions of elastomer chemistry, accelerated chemical testing techniques, the

performance of multiple EPDM rubber-based products in chloraminated water, and the

engineering and design of potable water plumbing systems, among other issues. Given the

scientific and technical complexity of these issues, the Court finds that Defendant's denials were

not unreasonable. *See Marchand*, 22 F.3d at 937 ("[T]he true test under Rule 37(c) is not

whether a party prevailed at trial but whether [the party] acted reasonably in believing that [it]

might prevail."). *See also Scheufler v. Gen. Host Corp.*, 915 F. Supp. 236, 239 (D. Kan. 1995)

(holding that denial of requests for admission "involv[ing] complicated scientific issues about

PAGE 9 – OPINION AND ORDER

which there is little agreement among the experts" did not warrant fees under Rule 37(c)(2)); *Bd. of Dirs., Water's Edge, a Condo. Unit Owner's Ass'n v. Anden Grp.*, 136 F.R.D. 100, 106-07 (E.D.Va. 1991) (holding that sanctions were unwarranted because it was not unreasonable for party to deny "complex and contested factual matter[s]"); *Dyer v. United States*, 633 F. Supp. 750, 759 (D. Or. 1985) (holding that denials of requests for admission were reasonable in light of "difficult factual question" regarding helicopter wake turbulence). *But see Marchand*, 22 F.3d at 937 (citing *Dyer* with approval for the proposition that a "defendant [is] entitled to rely on expert testimony to deny [a] difficult request for factual admission," but declining to adopt "a per se rule that reliance on an expert opinion provides a reasonable ground for a party to believe he would prevail at trial"). For this additional reason, the court denies Plaintiff's motion for attorney fees and expert costs associated with Plaintiff proving at trial the substance of the requested admissions.

## B.  Defendant's Motion for Judgment as a Matter of Law

Defendant renews its motion for judgment as a matter of law on four grounds: (1) Plaintiff suffered no cognizable property damage as a matter of law and thus may not bring an action in tort under the "economic loss doctrine"; (2) Plaintiff's damages are speculative; (3) there was no evidence presented at trial that Defendant's products were unreasonably dangerous; and (4) there was no evidence presented at trial that any degradation of Defendant's products was caused by a design defect. The Court addresses each argument in turn.

### 1.  Whether Plaintiff suffered property damage as a matter of law

At the outset, Defendant argues that that the economic loss doctrine bars Plaintiff from recovering damages in tort. Defendant concedes, however, that this argument is identical to that made in Defendant's Motion for Summary Judgment (Dkt. 89) and Renewed Motion for Summary Judgment (Dkt. 223). As Defendant presents no new reasons for the Court to

reconsider its ruling on the application of the economic loss doctrine to the facts of this case, the Court declines to address this argument for a third time.

Next, Defendant makes two additional, but related, arguments. First, Defendant argues that Plaintiff failed to present sufficient evidence at trial of any "property damage" resulting from black particles being found in the Benson Tower's potable water system. Second, Defendant argues that Plaintiff failed to present any evidence at trial from which a reasonable jury could conclude that the Victaulic products were defective and would eventually leak. Viewing all the evidence presented at trial in the light most favorable to Plaintiff, as the Court must on a motion for judgment as a matter of law, both of these additional arguments fail.

### a.  Plaintiff's evidence of property damage

Plaintiff presented extensive evidence at trial regarding black particles being found in the Benson Tower's potable water system. Plaintiff's expert witness Jerry Leyden testified at trial that the black particles found in the potable water system in the Benson Tower were composed of EPDM rubber and that the same type of EPDM black particles were found during the ASTM D-6284 testing of Defendant's products performed by Mr. Leyden. Trial Tr. vol. 6, 1191-93, Jan. 13, 2015. Similarly, Plaintiff's expert witness Dr. Gerald Fuller testified that the degradation of the Victaulic products continued to release "carbon black" into the potable water system at Benson Tower, that this degradation was observable throughout the system, and that the problem could be remedied only by removal of the defective Victaulic products. Trial Tr. vol. 3, 583-585, Jan. 7, 2015. Plaintiff's witness Baron Adams also testified that he had observed similar black particles in other Portland buildings with Victaulic products and that these black particles routinely clogged filters and aerators in these buildings. Trial Tr. vol. 5, 960-61, Jan. 12, 2015. Taking this evidence in the light most favorable to Plaintiff, this evidence is more than sufficient to establish that Plaintiff suffered cognizable property damage to its potable water system.

**b.  Plaintiff's evidence that Victaulic's products would eventually leak**

Plaintiff also presented evidence at trial regarding the premature failure of the Victaulic products installed in the Benson Tower. Dr. Fuller testified to the risks of future leaks caused by the progressive degradation of the Victaulic products. Trial Tr. vol. 3, 583-85, Jan. 8, 2015. Dr. Fuller examined numerous Victaulic products in front of the jury, demonstrating how the Victaulic products had substantially degraded at the thinnest portion of the rubber, that this degradation had occurred far earlier than should have been expected, and that further degradation would inevitably cause leaks in the potable water delivery system. Mr. Leyden also testified to observed EPDM degradation and confirmed Dr. Fuller's observations. Trial Tr. vol. 6, 1201-3, Jan. 13, 2015. Taking this evidence in the light most favorable to Plaintiff, Plaintiff sufficiently established that the Victaulic products were failing and would inevitably cause leaks in the potable water delivery system.

**2.  Whether Plaintiff's claimed damages were speculative**

Defendant argues that because no evidence of leaks at the Benson Tower was presented at trial Plaintiff's damages are speculative as a matter of law. The evidence presented at trial, however, showed that the EPDM in the Victaulic products installed in the Benson Tower were degrading and releasing black particles into the potable water system. Plaintiff's expert testimony showed that these particles were composed of EPDM. The jury heard testimony that other Portland buildings that do not have Victaulic products installed do not have these black particles. Plaintiff's expert testimony further showed that the Victaulic products were degrading, substantially reducing the useful life of the products and eventually requiring full replacement of the Victaulic products to prevent further contamination of the potable water system and leakage from the potable water delivery system at Benson Tower. Thus, Plaintiff's damages, when viewed in the light most favorable to Plaintiff, are not speculative. The evidence presented at

PAGE 12 – OPINION AND ORDER

trial showed that the Victaulic products were defective and that the defective Victaulic products caused damage to Plaintiff's property and would continue to do so until replaced. Plaintiff's damages were the reasonable replacement costs of the defective products.

### 3.  Whether Plaintiff presented sufficient evidence that Defendant's products were unreasonably dangerous due to a defective design

Defendant argues that Plaintiff failed to present sufficient evidence at trial that the Victaulic products were unreasonably dangerous due to a defective design. Specifically, Defendant contends that Plaintiff failed to show an unreasonably dangerous product under either a "representational approach" or a "risk-utility approach" to the "consumer expectations test" under Oregon law. The Court first describes the consumer expectations test and then addresses the sufficiency of Plaintiff's evidence.

### a.  Elements of strict products liability by defective design

Under Oregon law, the necessary elements of a products liability case involving a design defect are: (1) the sale or leasing of a product by one engaged in the business of selling or leasing such products; (2) a product that was expected to, and did, reach the user or consumer without substantial change in condition; (3) a product that, when sold, was in a defective condition unreasonably dangerous to the user or consumer; and (4) injury to the user or consumer, or damage to his or her property; (5) that was caused by the product's defective condition. *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 77 n.15 (2001). As to the third element, "the controlling test . . . in Oregon is the consumer expectations test." *Id.* at 79. "When a plaintiff alleges that a product is in a defective condition unreasonably dangerous to the user or consumer, the plaintiff must prove that, when the product left the defendant's hands, the product was defective and dangerous to an extent beyond that which the ordinary consumer would have expected." *Id.* (citation and quotation marks omitted). "Whether a product is dangerous to an

extent beyond that which would be contemplated by the ordinary consumer is a factual question to be determined by the jury." *Id.* at 77. A trial court must, however, "ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect." *Id.* Because Or. Rev. Stat. ("ORS") § 30.910 creates a rebuttable presumption that a product is not defective, "a plaintiff may not rely on the bare assertion of a defect from which a jury may infer unreasonable dangerousness; rather, a party must affirmatively put forth some evidence on the issue of dangerousness before the issue may properly be submitted to a jury." *Russell v. Deere & Co.*, 186 Or. App. 78, 83 (2003).

Under Oregon law, consumer expectations about how some products should perform under a particular set of circumstances may, in some cases, be within the realm of jurors' common experience. *McCathern*, 332 Or. at 78. In other cases, however, the products or circumstances involved may be such that the average person would not know what to expect. *Id.* "When a jury is unequipped, either by general background or by facts supplied in the record, to decide whether [a product] failed to perform as safely as an ordinary consumer would have expected . . . additional evidence about the ordinary consumer's expectation is necessary." *Id.* (quotation marks omitted) (alteration in original). This additional evidence may include advertising or other representations by the defendant about how a product can be used and will perform.[2] *Id.* at 79. In a design defect case, this additional evidence may also consist of risk-utility balancing—proving that a practicable and feasible design alternative was available. *Id.* at 78. These two approaches are generally referred to as the "representational" approach and the "risk-utility" approach, respectively. *Id.* at 76. A plaintiff may establish consumer expectations

---

[2] This is evidence from which the expectations of an ordinary consumer can be adduced; however, "such evidence by itself rarely will demonstrate that a product is defective." *McCathern*, 332 Or. at 79.

under the "representational" approach "by proving that the manufacturer specifically represented to the consuming public that the product would be able to perform certain functions, when, in fact, it could not, resulting in the plaintiff's injury." *Id.* (citation omitted). A plaintiff may also establish consumer expectations under the "consumer risk-utility" approach by proving "that a product could have feasibly and practicably been designed more safely." *Id.* (citation omitted).[3]

---

[3] The Court notes that, contrary to Defendant's erroneous representation based on superseded case law, the "representational" approach and the "risk-utility" approach are not separate theories of liability. Instead, these approaches go to the sufficiency of the Plaintiff's evidence demonstrating consumer expectations. As the Oregon Supreme Court explained:

> We emphasize that, whether or not evidence related to risk-utility balancing is necessary to satisfy a plaintiff's burden of proof, a plaintiff's *theory* of liability under ORS 30.920 remains the same: That the product was dangerously defective and unreasonably dangerous because it failed to perform as the ordinary consumer expects. In other words, contrary to the Court of Appeals' opinion [in *McCathern v. Toyota Motor Corp*, 160 Or. App. 201 (1999)], "consumer risk-utility" is not a separate "theory of liability" under the statutorily mandated consumer expectations test.

> The . . . "representational" approach also is not a separate "theory of liability" under the consumer expectations test. Although advertising and promotional materials may be sufficient to demonstrate what the ordinary consumer expects from a product in some cases, such evidence by itself rarely will demonstrate that a product is defective.

> In sum, we conclude that the controlling test for design defect in Oregon is the consumer expectations test. ORS 30.920. When a plaintiff alleges that a product is "in a defective condition unreasonably dangerous to the user or consumer," ORS 30.920(1), the plaintiff must prove that, when the product left the defendant's hands, the product was defective and dangerous to an extent beyond that which the ordinary consumer would have expected.

*McCathern*, 332 Or. at 79 (emphasis in original).

PAGE 15 – OPINION AND ORDER

### b. Sufficiency of Plaintiff's evidence

When viewing the evidence presented at trial in the light most favorable to Plaintiff, the Court finds that Plaintiff presented sufficient evidence to establish that the Victaulic products were defective "to an extent beyond which the ordinary consumer would have expected." *Id.* at 79. Plaintiff's expert witnesses provided extensive testimony regarding the degradation of the Victaulic products and determined that this degradation was both premature and caused by chloramine exposure. Plaintiff's expert Dr. Fuller, for example, provided extensive evidence regarding the premature and unexpected degradation of Victaulic's products. Plaintiff similarly presented evidence at trial that Defendant was aware of the premature degradation of its products when exposed to chloramine but that Defendant continued to sell these products to consumers. Plaintiff's expert Mr. Leyden also opined that Victaulic's EPDM rubber could be reasonably formulated to be more resistant to chloramine attack. Further evidence that products made by Victaulic's competitors were more resistant to chloramine attack corroborated Mr. Leyden's testimony. Taken in the light most favorable to Plaintiff, this evidence was sufficient to meet Plaintiff's burden of proof.

### 4. Whether Plaintiff presented sufficient evidence that the degradation of Defendant's products and the resulting damage to Plaintiff's property were caused by a design defect

Finally, Defendant argues that Plaintiff failed to present sufficient evidence of causation on its products liability claim. Under Oregon law, "[i]n addition to presenting proof as to the condition of the defendant's product, the plaintiff in a strict liability case is required to establish that such condition proximately caused his injuries or damages." *Gilmour v. Norris Paint & Varnish Co.*, 52 Or. App. 179, 184 (1981) (quotation marks omitted); *see also Edmons v. Home Depot, U.S.A., Inc.*, 2011 WL 127165, at *8 (D. Or. Jan. 14, 2011) (same); *McCathern*, 332 Or. at 77 n.15 (noting that causation is a required element in a strict product liability case). "This

requires that a plaintiff 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. A mere possibility of such causation is not enough . . . .'" *Edmons*, 2011 WL 127165, at *8 (quoting *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1298 (D. Or. 1996)).

At explained above, Plaintiff provided extensive evidence at trial from its expert witnesses Dr. Fuller and Mr. Leyden regarding the premature chemical degradation of the Victaulic products as a result of chloramine exposure. The testimony of Dr. Fuller and Mr. Leyden showed that Victaulic's EP-12 EPDM was of inferior quality to that of other alternative products. Moreover, Plaintiff presented evidence at that trial that Victaulic was aware of problems associated with chloramine attack before February 2007, and that other buildings in Portland with non-Victaulic products do not have similar degradation. When viewed in the light most favorable to Plaintiff, this evidence provides a sufficient basis for a reasonable jury to find that Defendant's products were defectively designed and that they caused Plaintiff's damages.

## C.  Motion for New Trial

Defendant also moves, in the alternative, for a new trial under FRCP 59(a)(1)(A) on Plaintiff's claim for strict products liability. In support of this motion, Defendant makes 11 separate arguments that it claims justify a new trial. The Court addresses each argument in turn.

### 1.  Whether allowing testimony regarding "black particles" being found in the water systems at other buildings that used Defendant's products was error

The Court allowed, over Defendant's objections, testimony by Baron Adams[4] that he had observed black particles at other buildings that had Victaulic products installed in their potable

---

[4] Plaintiff's expert witness Gerald Leyden also provided testimony related to black particles being found in the potable water systems of other Portland buildings that used Victaulic products.

water systems. Defendant contends that the admission of this testimony was prejudicial error warranting a new trial.

At a pretrial conference held on December 22, 2014, the Court asked council to discuss the relevance of warranty claims received by Victaulic after February 2007, the date by which all Victaulic products at issue in this case had been installed in the Benson tower. At that time, Plaintiff argued for the admission of evidence related to post-2007 warranty claims to rebut Defendant's potential arguments that the alleged problems with the Benson Tower's potable water system was a unique event or was somehow caused by the Portland water supply. Subsequently, the Court held that evidence related to warranty claims made after February 2007 would only be admitted under certain limited circumstances. *See* Dkt. 236. During the pretrial conference, however, the Court explained the circumstances under which the Court would consider modifying this ruling and allowing evidence of post-2007 warranty claims. As the Court explained:

> If [Defendant does not] open that door, there is nothing relevant to whatever happened after February 2007. If [Defendant does] open the door, with the defense either that this is a problem unique to Benson Tower, or it's somehow caused by the Portland water supply along the lines that you've described, then they may be making that evidence relevant. But until [Defendant] open[s] that door, I don't see how it is relevant.

Dkt. 237, p 19.

At trial, during the cross examination of Plaintiff's expert witness Dr. Thomas Rockaway, Defendant's counsel elicited testimony from Dr. Rockaway related to Defendant's argument that the chemicals or particulate matter found in the Benson Tower's potable water system may have come from exogenous sources. *See, e.g.*, Trial Tr. vol. 2, 318-19, Jan. 7, 2105. Later at trial, Plaintiff called Baron Adams to testify regarding his observations related to black particles being found in the potable water system in other buildings in Portland that used

PAGE 18 – OPINION AND ORDER

Victaulic products. Trial Tr. vol. 5, 958-59, Jan. 12, 2015. Defendant objected to this testimony based upon the Court's prior ruling that post-2007 warranty claims would be admitted only under limited circumstances. The Court overruled this objection based upon Defendant's decision to elicit testimony from Dr. Rockaway suggesting that the black particles found in the water system at the Benson Tower must have come from elsewhere in the Portland water supply and were not caused by Victaulic products prematurely degrading. *Id.* at 959.

Defendant now argues that the admission of this evidence was prejudicial error warranting a new trial for three reasons: (1) Defendant was unfairly surprised by this testimony; (2) the probative value of this testimony was substantially outweighed by undue prejudice to Defendant; and (3) Defendant now possesses new, post-trial evidence that Defendant states raises questions about the accuracy of Mr. Adams' testimony. The Court addresses each argument in turn.

### a.  Whether Defendant was unfairly surprised by Baron Adams' testimony

Victaulic argues that it was unfairly surprised by Mr. Adams' testimony. This argument is unpersuasive. Defendant could not have been unaware of the content of Mr. Adams' testimony. First, Plaintiff's witness statement for Mr. Adams, submitted several weeks before trial began, disclosed that that Mr. Adams would "testify about Victaulic Products in the Portland area, and [his] knowledge of deterioration of those products in numerous buildings in Portland." Dkt. 115, p. 19. Second, Defendant's witness Daniel Rapp was specifically retained by Victaulic to investigate at least 15 of the buildings identified by Mr. Adams at trial. Trial Tr. vol. 6, 1173-75, Jan. 13, 2015. Third, Defendant's witness J.J. Weaks similarly testified that he had observed EPDM degradation in Victaulic products in other Portland buildings. Trial Tr. 5, 898, Jan. 12, 2015. Fourth, the disclosed expert witness statement of Plaintiff's expert witness Jerry Leyden included Mr. Leyden's opinions on the performance of Victaulic products in other

Portland buildings. In sum, Defendant was fully aware before trial of the content about which

Mr. Adams testified to at trial.

Furthermore, Victaulic's claim that it was unfairly surprised by Mr. Adams testimony is

also unpersuasive because Mr. Adams gave very similar testimony in a very similar trial against

Victaulic involving the *Edge Lofts* building in Portland in May 2013. [5] In that case, the *jury*

asked the following question of Mr. Adams at trial: "In your experience, are the particles found

in the aerators and storage tank unusual when compared to other commercial condominium

buildings in Portland?" Dkt. 305, p. 282. The court excused the jury, and Mr. Adams told the

judge: "With the Victaulic system installed, yes, it is typical." *Id.* The jury in the *Edge Lofts*

matter was not permitted to hear this answer. In the instant case, however, the Court was clear

that if Defendant "opened the door" to such testimony by arguing or implying that the alleged

problems at the Benson Tower were unique to that building as opposed to also being found in

other buildings in Portland using Victaulic products, then such testimony would be allowed.

Despite this prior ruling (and warning) from the Court, Defendant made the strategic choice at

trial to elicit such testimony. Accordingly, Defendant's protestations of surprise lack merit, and

Defendant is not entitled to a new trial on this basis.

### b. Whether the probative value of Baron Adams' testimony was substantially outweighed by unfair prejudice to Defendant

Defendant argues that Mr. Adams' testimony lacked any probative value, and thus the

Court must presume Defendant was prejudiced by its inclusion. This argument is without merit.

The Court's pretrial ruling regarding post-2007 warranty claims received by Victaulic was clear:

> If [Defendant does] open the door, with the defense either that this
> is a problem unique to Benson Tower, or it's somehow caused by

---

[5] Defendant's counsel in *Edge Lofts* trial was also counsel for Defendant in the instant
case involving Benson Tower.

the Portland water supply along the lines that you've described,
then they may be making that evidence relevant.

Dkt. 237, p. 19. At trial, the Court found that Defendant had opened the door to testimony

regarding black particles in other buildings by making the very arguments mentioned by the

Court in its pretrial ruling. Mr. Adams' testimony regarding black particles was relevant to rebut

Defendant's points, and the mere fact that Mr. Adams' testimony undermined Defendant's

theory of the case does not create "unfair prejudice" within the meaning of Rule 403 of the

Federal Rules of Evidence. That rule specifically contemplates a balancing of the probative value

of evidence against the unfair harm likely to result from its admission. Here, despite the Court's

clear pretrial warning, Defendant chose a trial strategy that put the issue of black particles found

in the water systems in other buildings directly at issue. Defendant may not now reasonably cry

foul because it faced negative consequences from its own choice.

### c.  Whether Defendant's "new" evidence provides a basis for a new trial

In order to establish that newly discovered evidence warrant a new trial, Defendant must

establish that: (1) the evidence was discovered after trial; (2) the exercise of due diligence would

not have resulted in the evidence being discovered at an earlier stage; and (3) the newly

discovered evidence is of such magnitude that production of it earlier would likely have changed

the outcome of the case. *See Defenders of Wildlife v. Bernal*, 204 F.3d 920, 929 (9th Cir. 2000)*;*

*Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987).

Defendant contends that it has discovered new evidence in the ongoing separate litigation

in the *Avenue Lofts* matter, another lawsuit involving still another building in Portland (Avenue

Lofts) that used Victaulic products. (The same plaintiff's counsel and defense counsel are

involved in that case.) According to Defendant, this "new" evidence undermines the testimony of

Plaintiff's witness Baron Adams in the *Benson Tower* trial, and this new evidence warrants a

new trial. Specifically, Defendant claims that it recently issued subpoenas to all buildings listed

on Plaintiff's Amended Cross-Reference List of Buildings with Victaulic Product. Dkt. 263. In

response to these subpoenas, Defendant asserts that *three* of the thirty-one listed buildings

responded that they were not in possession of any of the documents responsive to Defendant's

subpoena requests.[6] Defendant's new evidence, however, is an insufficient basis for a new trial.

The subpoena responses submitted by Defendant indicate only that these three buildings are not

in possession of certain documents requested by Defendant or that they are currently unaware of

any problems associated with black particles.[7] The mere absence of these documents does not

sufficiently undermine the testimony of Mr. Adams and is of insufficient magnitude such that

production of it sooner would likely have changed the outcome of this case.

> ### 2.   Whether including Baron Adams' name in Jury Instruction No. 13's list of witnesses who provided both fact and opinion testimony was error

Defendant argues that the Court's characterization of Baron Adams in the jury

instructions as one of several fact witnesses who also gave expert testimony was prejudicial error

warranting a new trial. Plaintiff responds that it does not dispute Defendant's assertion that

Mr. Adams was testifying only as to his observations related to black particles in other Portland

buildings. Plaintiff also does not dispute that Mr. Adams was not disclosed before trial as an

expert witness for Plaintiff. Instead, Plaintiff argues simply that Defendant did not object to the

---

[6] In its briefing, Defendant represents that all three of the buildings from which Defendant has received responses indicated, in Defendant's words, that "[the buildings] are not aware of any issues relating to black particles in their respective plumbing systems." Defendant's representation does not appear to be precisely accurate. The response from one building, the Broadway Vantage Apartments, includes a hand written note that states: "We have found no evidence of black particles in the building and thus have not investigated further." Dkt. 306. The other responses submitted by Defendant, however, indicate only that the subpoena recipient is not in possession of any responsive documents.

[7] Exactly what documents Defendant requested in these subpoenas is not indicated in Defendant's declaration. *See id.*

opinion testimony provided by Mr. Adams at trial, and has thus has waived any objection. Moreover, because Mr. Adams gave both fact and opinion testimony, the jury instruction listing him, among others, as a hybrid fact and opinion witness was proper.

Defendant cites *Estate of Barabin v. AstenJohnson*, *Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc), and *U.S. v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997), to support the proposition that labeling Mr. Adams' as a fact witness who also gave opinion testimony warrants a new trial. Those cases are distinguishable, however, as in each case counsel timely objected at trial to the allegedly improper opinion testimony. Here, Defendant chose not to object at trial to any of Mr. Adams' allegedly objectionable opinions. Therefore, the Court's characterization of Mr. Adams as a fact witness who also gave opinion testimony was not error.

### 3. Whether allowing Plaintiff to refer to other warranty claims was error

Defendant argues that the Court's decision to admit Plaintiff's Exhibit 29-6 and Plaintiff's reference to this document during closing argument[8] was prejudicial error. Plaintiff's Exhibit 29-6 was a page from an internal power point presentation prepared by Victaulic in May 2010. This exhibit included a slide referencing "twenty three new claims since 09/09." As discussed above in relation to Defendant's first argument for a new trial, the Court allowed Plaintiff to reference warranty claims received by Victaulic after 2007 in the context of Victaulic's internal investigation into potential degradation of Victaulic products related to chloramine exposure. This exhibit was admitted in evidence during the cross-examination of Victaulic executive Lawrence Thau, during which time defense counsel questioned Mr. Thau regarding its contents.

---

[8] Defendant's objections to Plaintiff's closing argument are discussed below.

Defendant now contends that Plaintiff's reference to this exhibit during closing argument made an "unduly prejudicial and confusing connection between other warranty claims that occurred after the installation of the product at the [Benson Tower] (and without any additional discussion of the nature of the warranty claims), and the claimed damages at issue."  The Court disagrees. Defendant was free to examine the contents of Exhibit 29-6 with Mr. Thau on redirect and Defendant could have clarified any potential confusion that may have been present. Defendant was also free to comment in its closing that the claims identified in Exhibit 29-6 occurred after the installation of the Victaulic products in the Benson Tower or that the claims may have come from buildings exposed to different levels of chloramine than the Portland buildings referred to at trial. The Court finds that Defendant was not unduly prejudiced by the admission of this exhibit.

### 4.    Whether refusing to allow Mr. Beekoy to testify as a defense witness was error

Before trial, Plaintiff listed Rodger Beekoy as a potential expert witness for Plaintiff. Plaintiff, however, did not call Mr. Beekoy to testify at trial. Defendant then attempted to call Mr. Beekoy to testify during Defendant's case, and Plaintiff objected based upon Defendant's failure to include Mr. Beekoy on Defendant's own witness list. The Court sustained Plaintiff's objection. Defendant now argues that this was prejudicial error. Defendant, however, failed to comply with the Court's pretrial order, which required both parties to disclose all lay and expert witnesses whom they intended to call at trial and to provide a summary of each witness's expected testimony. Dkt. 75. The pretrial order further stated: "No exhibits or testimony will be received in evidence at trial unless presented in accordance with this Order." *Id.*, p. 7. Defendant fails to provide any explanation for its failure to comply with this Order.[9]

---

[9] Defendant argues that because its witness list included "a statement putting the [Plaintiff] HOA on notice that Victaulic reserved all of its rights to call any witness on

"'All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders.'" *Aloe Vera of Am., Inc. v. United States,* 376 F.3d 960, 964-65 (9th Cir. 2004) (quoting *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001)). Regarding a district court's authority to order compliance with pre-trial case management order, the Ninth Circuit has explained:

> [T]he district court is charged with effectuating the speedy and orderly administration of justice. There is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified, that the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly.

*United States v. W.R. Grace*, 526 F.3d 499, 508-09 (9th Cir. 2008). Here, whatever prejudice Defendant faced, if any, was the result of Defendant's failure to comply with the requirements of the Court's Civil Trial Management Order. Accordingly, the Court finds no error.

### 5. Whether allowing Plaintiff's expert testimony was error

Defendant argues that the Court erred by allowing Plaintiff's experts to testify that: (1) EPDM particles released from Victaulic products can cause adverse health effects; (2) the 606/607 gaskets made by Victaulic exhibited accelerated or premature degradation such that they will fail within the useful life of the gasket; and (3) chloramine in concentrations of 2.2 ppm or less is causing accelerated or premature degradation of the Victaulic products at issue. Before trial, Defendant filed a Motion to Exclude Plaintiff's Expert Witness Testimony in which

---

[Plaintiff's] witness list," it was excused from complying with the Court's Civil Trial Management Order. Such a "reservation of rights," however, is not contemplated by the Court's Civil Trial Management Order; more significantly, such a "reservation" does not provide the required summary of anticipated witness testimony.

Defendant made these same arguments. Dkt 199. The Court denied that motion during the

pretrial conference on December 22, 2014, stating:

> I have reviewed defendant's Daubert motions relating to Dr. Gerald
> Fuller, Jerry Leyden, and Roger Bekooy, and those are denied. I
> think that their testimony, as well as the testimony of defendant's
> witnesses Edward Saltzberg and Peter Elliott, I'm satisfied that
> they satisfy the requirements under Rules 702 and 703 and that the
> objections that each side makes to the other side's expert witnesses
> there go to weight, not admissibility.

Dkt. 237 (Tr. 87:12-20); *see also* Dkt. 236, at 12. Defendant contends that this ruling was legal

error.

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is

admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill,

experience, training, or education; (2) the scientific, technical, or other specialized knowledge

will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the

testimony is based on sufficient facts or data; (4) the testimony is the product of reliable

principles and methods; and (5) the expert has reliably applied the relevant principles and

methods to the facts of the case. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th

Cir. 2014); Fed. R. Evid. 702.

"Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into

admissibility is a flexible one." *City of Pomona*, 750 F.3d at 1043 (citing *Alaska Rent–A–Car,*

*Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert

testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558,

565 (9th Cir. 2010) (citation and quotation marks omitted). "[T]he trial court must assure that the

expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 564

(internal quotation marks omitted). "Expert opinion testimony is relevant if the knowledge

underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge

underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona*, 750 F.3d at 1043 (citing *Alaska Rent–A–Car*, 738 F.3d at 969). In short, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

Furthermore, the test of reliability is a flexible one. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc). The court must assess an expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *Id*. But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted). The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 564-65. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. *City of Pomona*, 750 F.3d at 1044. "A district court should not make credibility determinations that are reserved for the jury." *Id.*

Here, Defendant presents the same arguments it made in its Motion to Exclude Plaintiff's Expert Witness Testimony. Reviewing Defendant's arguments once again, the Court finds no

proper basis for excluding Plaintiff's expert witness testimony, and thus, no basis for a new trial. Plaintiff's experts satisfied the requirements of Rules 702 and 703, and Defendant's arguments go to weight, not admissibility. Accordingly, the weight of the evidence presented by Plaintiff's experts properly was an issue to be decided by the jury.

### 6. Whether declining to bifurcate the trial was error

Defendant argues that the Court's denial of Defendant's Motion to Bifurcate Trial (Dkt. 142) resulted in undue prejudice to Defendant. Specifically, Defendant argues that the admission of evidence related to Victaulic's financial status and size before the jury rendered a verdict on liability was unduly prejudicial. The Court finds no merit in this line of argument.

Federal Rule of Civil Procedure 42(b) provides that a court may "order a separate trial of one or more separate issues" for "convenience, to avoid prejudice, or to expedite and economize." The moving party carries the burden of proving that bifurcation is warranted in a particular case. *Clark v. I.R.S.*, 772 F. Supp. 2d 1265, 1269 (D. Haw. 2009). Whether to grant bifurcation is left to the sound discretion of the district court. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004). In determining whether bifurcation of damages is appropriate, bifurcation "is the exception rather than the rule of normal trial procedure" within the Ninth Circuit. *Clark*, 772 F. Supp. 2d at 1269 (citing *Hangarter*, 373 F.3d at 1021).

As the Court explained in its ruling on Defendant's pre-trial Motion to Bifurcate (Dkt. 212), Defendant not only failed to meet its burden of proving that bifurcation was warranted, but also failed to sufficiently explain why appropriate jury instructions were insufficient to cure any potential jury confusion. The Court further explained that:

> [Q]uestions of liability and damages are not wholly separate
> questions in this case. As the Ninth Circuit has recognized, because
> "the evidence usually overlaps substantially, the normal procedure

> is to try compensatory and punitive damage claims together with appropriate instructions to make clear to the jury the difference in the clear and convincing evidence required for the award of punitive damages." *Hangarter*, 373 F.3d at 1021 (quoting *McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 871 (7th Cir. 1994)). Plaintiff persuasively argues that much of the evidence at issue in this case is relevant to both liability and punitive damages. Defendant neither directly addresses this argument, nor explains why appropriate instructions to the jury are insufficient to alleviate any potential prejudicial effect.

*Id.* at 3. This ruling was consistent with Ninth Circuit precedent. *See Hangarter*, 373 F.3d at 1021.

Moreover, as in its pre-trial motion to bifurcate, Defendant again fails to explain how the Court's jury instructions were insufficient to cure any potential jury confusion. Instead, Defendant curiously cites to *BMW of N. Am., Inc. v. Gore*, 517 U.S. 572 (1996), and to *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003), two Supreme Court cases discussing due process concerns related to punitive damages awards, for the proposition that the jury's award of only compensatory damages was tainted by the admission of evidence related to Victaulic's financial status. In effect, Defendant reasons that, even though the jury did not award punitive damages, the award of compensatory damages was actually an award of punitive damages in disguise and was a result of improper jury sympathy. There is, however, an "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see also Kansas v. Marsh*, 548 U.S. 163, 179 (2006). Accordingly, as Defendant provides no more than speculation suggesting otherwise, the Court presumes that the jurors followed the Court's jury instructions and awarded damages based only upon a finding of actual liability and damages.

### 7.   Whether excluding Daniel Rapp's lay opinion testimony was error

Defendant argues that it was prejudicial error for the Court to exclude the testimony of Daniel Rapp regarding the gasket cleaning procedure that Mr. Rapp developed with Dr. Peter Elliot. Defendant argues that the exclusion of this testimony was unduly prejudicial because it resulted in the jury being "left without an understanding of what was done by [*sic*] to the gaskets that were removed."

In the ruling on the parties' pretrial motions, the Court held that "Mr. Rapp may provide lay testimony in which he states his observations. He may not, however, provide any opinion testimony concerning his observations (or about any other matter described in his witness statement) until after an appropriate foundation has been laid at trial consistent with Fed. R. Evid. 702." Dkt. 236. At trial, Defendant attempted to solicit opinion testimony from Mr. Rapp concerning the gasket cleaning procedure. Consistent with the Court's ruling, Plaintiff objected to this testimony based upon Mr. Rapp's lack of qualifications and the Court properly sustained that objection.

Further, Defendant's contention that the exclusion of Mr. Rapp's testimony regarding the gasket cleaning procedure somehow prejudiced Defendant is without merit. Defendant concedes that Mr. Rapp developed the testing procedure with Dr. Elliot. At trial, following the testimony of Mr. Rapp, Defendant elicited testimony from Dr. Elliot, a qualified expert, regarding the very same gasket cleaning procedure. At that time, Dr. Elliot gave a detailed explanation of the gasket cleaning procedure as well as the reasons for its development. Defendant's contention that the jury was "left without an understanding of what was done by [*sic*] to the gaskets that were removed," ignores the fact that Defendant's own expert witness, Dr. Elliot, provided extensive testimony regarding the gasket cleaning procedure. Accordingly, even if the exclusion of

Mr. Rapp's testimony was improper, Defendant fails to demonstrate that it suffered any prejudice by the exclusion.

### 8.  Whether excluding Defendant's exhibit 289 (Victaulic's catalog) was error

At trial, Defendant offered exhibit 289, a Victaulic product catalog, and Plaintiff objected on the basis that the catalog was not disclosed before trial. Consistent with the requirements of the Court's Civil Trial Management Order, the Court sustained Plaintiff's objection.[10] Defendant now argues that the Court's exclusion of trial exhibit no. 289 substantially prejudiced Defendant. Defendant fails, however, to provide any explanation for Defendant's failure to comply with the clear requirements of the Court's Civil Trial Management Order, which mandated that "[n]o exhibits or testimony will be received in evidence at trial unless presented in accordance with this Order. Late submissions . . . will not be accepted unless there has been a showing of good cause." Dkt. 75, p. 7.

As explained previously, it is firmly established law that "district courts have inherent power to control their dockets." *Atchison*, 146 F.3d at 1074 (quotation marks omitted). "'All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders.'" *Aloe Vera of Am., Inc. v. United States,* 376 F.3d 960, 964-65 (9th Cir. 2004) (quoting *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001)). Here, whatever prejudice Defendant faced, if any, was the result of Defendant's failure to comply with the clear requirements of the Court Civil Trial Management Order. Accordingly, the Court finds no error.

---

[10] As the Court explained at trial: "[Plaintiff's] objection is sustained. [Exhibit 289] was not disclosed in accordance with my directions to disclose pretrial exhibits, nor do I think of it as an appropriate impeachment exhibit. It doesn't impeach. [Exhibit] 289 will not be received." Dkt. 295, p. 16.

**9.    Whether the cumulative effect of the alleged errors warrant a new trial**

Defendant cites *United States v. Frederick*, 78 F.3d. 1370 (9th Cir. 1996), for the

proposition that "[i]n some cases, although no single trial error examined in isolation is

sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

prejudice a defendant." This is not such a case. As explained above, the Court finds that

Defendant has identified no prejudicial error justifying a new trial either individually or

collectively.

**10.    Whether Plaintiff's counsel made improper closing arguments to the jury**

Defendant contends that during Plaintiff's rebuttal closing, Plaintiff's counsel made

reference to inadmissible evidence and facts that had no evidentiary basis. Specifically,

Defendant contends that the following statements by Plaintiff's counsel were improper: (1)

Victaulic did not produce a single warranty claim in response to Plaintiff's request for

production; (2) during the course of litigation, Victaulic failed to explain to Plaintiff the reason

for the problems with the valves; and (3) that the ASTM D-6284 test was adopted in 1989.

Defendant contends that each of these statements was improper and warrants a new trial. The

Court addresses each allegedly improper statement in turn.

**a.    Statements regarding Defendant's failure to produce warranty claims in
response to Plaintiff's request for production**

In Plaintiff's rebuttal closing, Plaintiff's counsel stated:

> You have heard this is a normal-functioning plumbing system.
> They want you to believe it is the valve with the rust in it. Or it is
> the city water. Or it is—we heard stray currents. It is particulate.
> How do they explain 27 other buildings in Portland with Victaulic
> products that are degrading? Is it that all of those buildings are
> poorly constructed? None of those plumbing systems are
> constructed properly, despite the fact that they have different
> plumbers? Different contractors? Different developers? But let's
> say you accept that no one in Portland can design and construct a
> plumbing system properly. Let's just accept that. How do they

> explain Oakland, California? Or Denver, Colorado? Or Florida? Or
> Boston? How do they explain those? And who knows how many
> more, because they destroyed the documents. We asked for them.
> We asked, where are your warranty claims? We want them all.
> They didn't produce a single one. How do they explain that? It is
> completely illogical.

Trial Tr. vol. 7, 1395, Jan. 14, 2015. Defendant contends that this statement was false, as

Defendant did produce some documents related to warranty claims received by Victaulic. Thus,

Defendant argues, this statement improperly gave the jury the impression that Defendant was

lying or trying to hide the truth.

Plaintiff responds that Defendant erroneously removes this statement from its proper

context in order to give the impression that it was somehow improper. According to Plaintiff, the

above statement related to an exchange during cross-examination between Plaintiff's counsel and

Victaulic executive Lawrence Thau. Specifically, during cross-examination by Plaintiff's

counsel, Mr. Thau testified as follows:

> Q.    You also understand, sir, in this litigation, that we
> requested copies of all of the documents related to any of these
> warranty claims, the Boston claim, the Essex claim, anything that
> occurred with respect to your 606 and 608 products. Do you
> understand that?
>
> A.    Yes.
>
> Q.    And you also understand that Victaulic was unable to find
> any of the documents and produce those to us with respect to the
> Boston claim, the Essex claim, or any of the other claims that are
> referenced in the Rubber Palooza and Mr. Bossert's memo?
>
> A.    I just recall that we supplied boxes and boxes of claims,
> and I know that not all the claims that were requested were
> supplied.
>
> Q.    So there were documents from prior to 2007 that were not
> produced to us, correct, that contained warranty claims?
>
> A.    If those documents as you describe them were in our
> warranty claims system, our warranty claims system has a—it is

PAGE 33 – OPINION AND ORDER

part of our document retention policy. So it may be that those
particular documents had expired as documents in our warranty
claims system under the document retention policy.

Q.      And they would have been destroyed, correct?

A.      Yes. They would have been eliminated from our database.

Trial Tr. vol. 4, 656-57, Jan. 9, 2015. Given this prior exchange between Plaintiff's counsel and

Mr. Thau, the Court does not find that Plaintiff's counsel's statement during closing argument,

given its proper context, improperly gave the jury the impression that Defendant was lying or

trying to hide the truth. Moreover, Defendant did not object to this statement at trial. Defendant

could have objected at the time Plaintiff's counsels' allegedly incorrect statement was made, but

failed to do so.

Furthermore, even assuming that the statement improperly gave the jury the impression

that Defendant was lying or trying to hide the truth, statements made in closing are not evidence.

Both before and after the presentations of each party's case-in-chief, the Court gave the

following instruction to the jury:

> Arguments and statements by lawyers are not evidence. The
> lawyers are not witnesses. What they have said in their opening
> statements, will say in their closing arguments, and at other times
> is intended to help you interpret the evidence, but it is not
> evidence. If the facts as you remember them differ from the way
> the lawyers have stated them, your memory of them controls.

Any prejudice Defendant may have suffered as a result of Plaintiff's allegedly improper

statement was cured by the Court's jury instructions, and the Court must presume that the jurors

followed these instructions. *Richardson*, 481 U.S. at 206 (holding that there is an "almost

invariable assumption of the law that jurors follow their instructions"). Therefore, Plaintiff's

counsel's allegedly improper statement regarding what warranty claims were not produced by

Defendant is not a sufficient basis for a new trial.

PAGE 34 – OPINION AND ORDER

### b. Statements regarding Defendant's failure to explain to Plaintiff the reason for problems with Victaulic valves

Defendant argues that Plaintiff improperly argued during closing argument that Defendant was aware of Plaintiff's decision to replace the Victaulic products with ball valves and remained silent, but at trial attempted to argue that a replacement with ball valves was improper. Plaintiff responds that Plaintiff's counsel's statement, taken in context, was not inaccurate. At trial, Defendant argued that this evidence demonstrated that Plaintiff's decision to replace the Victaulic products with ball valves was unreasonable and amounted to an unwarranted "upgrade" to the plumbing system. In response to this argument, Plaintiff's counsel stated:

> Then they want to stand up again, as I predicted, and they want to blame the association for putting in ball valves, and they claim that wasn't necessary. Their own guy sat there and watched us do it. A Victaulic representative was there a year before, didn't say anything, and now they want to come in and blame the association for it? At no time in the face of all of this evidence have they ever said it is our fault.

Trial Tr. vol. 7, 1396, Jan. 14, 2015. According to Defendant, this statement by Plaintiff's counsel improperly gave the jury the impression that Defendant never told Plaintiff about installation of the wrong MasterSeal 300 valves and the potential for galvanic reactions in the plumbing system. Plaintiff claims this argument has "nothing to do" with the MasterSeal 300 valves.

The Court finds that Plaintiff's counsel's statement, given its proper context, was not improper. Moreover, even if Plaintiff's counsel's statement was improper, Defendant did not object to this statement at trial. Defendant could have objected at the time Plaintiff's counsels' allegedly incorrect statement was made, but failed to do so. More importantly, even assuming that Plaintiff's argument was somehow improper, as explained above, any prejudice Defendant

may have suffered as a result of Plaintiff's allegedly improper argument was cured by the Court's jury instructions. Because there is an "almost invariable assumption of the law that jurors follow their instructions," *Richardson*, 481 U.S. at 206, Plaintiff's counsel's allegedly improper argument is not a sufficient basis for a new trial.

### c. Statements regarding the adoption of the ASTM D-6284 testing standard in 1989

Defendant contends that Plaintiff's counsel's statement during her rebuttal closing that the ASTM D-6284 testing standard was established in 1989 was erroneous. *See* Trial Tr. vol. 7, 1397, Jan. 14, 2015. Defendant now argues that this statement was prejudicial, and thus warrants a new trial, because it gave the jurors the impression that Defendant was lying to the jury. Plaintiff concedes that this statement was inaccurate, but contends that Defendant suffered no prejudice as a result. The Court agrees.

As explained above, any prejudice Defendant may have suffered as a result of this statement was appropriately cured by the Court's jury instructions. *See Richardson*, 481 U.S. at 206. Furthermore, Defendant did not object to this statement at trial. Defendant could have objected at the time Plaintiff's counsels' incorrect statement was made, but failed to do so. Moreover, defense counsel was not unfairly prejudice by this statement, as Defendant's counsel carefully explained to the jury in Defendant's own closing argument that the ASTM D-6284 protocol was actually published in 2002. Accordingly, Plaintiff's counsel's alleged misstatement to the jury on this point is insufficient to warrant a new trial.

### 11. Whether the jury's verdict was against the clear weight of the evidence

Finally, Defendant contends that the jury's verdict went against the clear weight of the evidence. In determining the clear weight of the evidence, a district court has "the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by

substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quotation omitted). "The district court's denial of the motion for a new trial is reversible only if the record contains *no evidence* in support of the verdict." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1347 (9th Cir. 1985) (emphasis added). While a district court may view the evidence differently than the jury, a district court may not substitute its "evaluations for those of the jurors." *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003); *see also Silver Sage Partners, Ltd.*, 251 F.3d at 819 ("[A] district court may not grant a new trial simply because it would have arrived at a different verdict.").

Defendant makes five principal arguments that it claims demonstrate the jury's verdict was not supported by the clear weight of the evidence: (1) the ASTM D-6284 testing used by Plaintiff's expert witnesses is invalid and cannot be extrapolated to real world conditions; (2) Plaintiff's expert witness testimony was inadequate or of minimal weight; (3) Defendant's theory of the case presented "a complete explanation" for the problems in the potable water system; (4) the Portland water supply was the true source of the black particles found in the potable water system; and (5) the degradation on the Victaulic products is so minimal that it does not affect the performance of the product. Each of these objections by Defendant has been addressed in detail above, and the Court finds no basis for Defendant's assertion that no reasonable jury could find against Defendant on these points.

In addition to these five arguments, Defendant makes three[11] additional arguments that it claims also demonstrate that the jury's verdict went against the clear weight of the evidence: (1) that Victaulic's competitor's products demonstrate that Victaulic products met industry standards; (2) that Plaintiff was advised by plumbing consultants that complete replacement of the Victaulic products was unreasonable; and (3) that Plaintiff's response to the problems in the Benson Tower's potable water system does not demonstrate "credible concerns" about black particles or potential carcinogenic effects.

First, Defendant contends that plumbing products produced by Grinnell, one of Victaulic's competitors, provides evidence of an industry standard met by Victaulic's products and that the performance of EPDM products exposed to chloramine cannot be determined without reference to the specific system conditions of a water system. In other words, Defendant argues that, because the evidence at trial demonstrated that one competitor's products would not perform better than Victaulic's products, Victaulic products must be no worse than all other alternatives and any premature degradation of the Victaulic products is a result of system design flaws at the Benson Tower. The evidence presented by Plaintiff at trial, however, also showed

---

[11] Near the end of Defendant's motion for new trial, Defendant adds that the "we can't tell" rule of appellate procedure articulated by the Oregon Supreme Court in *Whinston v. Kaiser Found. Hosp.*, 309 Or. 350 (1990), precludes Plaintiff from prevailing on a general verdict for strict products liability because Plaintiff presented more than one "theory" of liability to the jury, thus warranting a new trial. A federal court, however, follows federal procedural law. *Kohlrautz v. Oilmen Participation Corp.*, 441 F.3d 827, 830 (9th Cir. 2006). In federal court, "[a]s a general rule, a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury." *Poppell v. City of San Diego*, 149 F.3d 951, 970 (9th Cir. 1998); *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1439 (9th Cir. 1996). As discussed earlier in relation to Defendant's motion for judgment as matter of law, because the Court finds that Plaintiff presented sufficient evidence on its single claim of strict products liability, Defendant is not entitled to judgment as a matter of law—or to a new trial on this basis. Contrary to Defendant's assertion, Plaintiff did not present more than one "theory of liability." *See* n. 3, *supra*.

that both the EPDM testing performed by Plaintiff's experts and that performed by Defendant's own employees demonstrated that other competitors' products performed superior to Victaulic's in regard to chloramine resistance.

Next, Defendant asserts that Plaintiff was advised by independent plumbing contractors that immediate removal of all Victaulic products was "unreasonable." Plaintiff, however, provided testimony from multiple members of the Benson's Home Owner's Association Board of Directors regarding their position that the Board did not wish to replace the degrading Victaulic products with more Victaulic products. Given evidence supporting both positions, the jury was able to weigh the reasonableness of Plaintiff's decision regarding replacement of the degrading Victaulic products.

Finally, Defendant argues that, because Plaintiff failed to contact the Portland Water Bureau or the Environmental Protection Agency to perform water quality testing, Plaintiff's concerns are not credible. Defendant similarly argues that residents of the Benson Tower continue to use the potable water system instead of bottled water, demonstrating that Plaintiff's concerns are entirely unjustified. Plaintiff, however, presented sufficient expert opinion evidence at trial regarding damage to the Benson Tower's potable water system. Moreover, Plaintiff's experts provided testimony regarding the reduced useful life of the Victaulic products that explained and justified Plaintiff's decision to remove Victaulic products from the building. Additionally, Plaintiff provided testimony from multiple residents of the Benson Tower who expressed their concern regarding the black particles being found in the potable water system and the steps they have taken to filter or avoid drinking that water.

Having reviewed the competing evidence presented by the parties on these points, the Court is not persuaded that the Jury's verdict was against the clear weight of the evidence.

PAGE 39 – OPINION AND ORDER

Defendant is correct that there was some evidence that supports its theory of the case. Defendant, however, had a full and fair opportunity to present its defense to the jury. The jury reasonably weighed both parties' evidence and found in favor of Plaintiff. Defendant is not entitled to a new trial simply because it is dissatisfied with the jury's conclusions.

## CONCLUSION

Plaintiff's Motion for Reasonable Expenses, Including Attorney's Fees (Dkt. 281), Defendant's Renewed Motion for Judgment as a Matter of Law (Dkt. 299), and Defendant's Motion for New Trial (Dkt. 301) are all DENIED.

**IT IS SO ORDERED**.

DATED this 11th day of May, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge